PALISADES PROPERTIES, INC., ETC., PLAINTIFF-RESPON-
DENT, v. JOSEPH J. BRUNETTI, ETC., *ET AL.*, DEFEND-
ANTS-RESPONDENTS, AND PALISADES INTERSTATE
PARK COMMISSION, ETC., DEFENDANT-APPELLANT.

SEALANTIC FUND, INC., A MEMBERSHIP CORPORATION,
ETC., PLAINTIFF-APPELLANT, v. PALISADES PROPER-
TIES, INC., ETC., *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued November 30, 1964—Decided February 24, 1965.

118 

120

Mr. *Harold H. Fisher* argued the cause for plaintiff-appellant Sealantic Fund, Inc. (*Messrs. Shanley & Fisher,* by *Mr. Bernard M. Shanley,* attorneys; *Mr. Frank L. Bate* and *Mr. Raymond M. Tierney, Jr.,* of counsel and on the brief).

Mr. *Joseph A. Davis* argued the cause for plaintiff-respondent Palisades Properties, Inc. (*Messrs. O'Mara, Schumann,*

*Davis & Lynch*, attorneys; *Mr. Joseph A. Davis*, of counsel and on the brief).

*Mr. William V. Breslin* argued the cause for defendant-respondent Boro of Fort Lee.

*Mr. Alan B. Handler*, First Assistant Attorney General, argued the cause for defendant-appellant Palisades Interstate Park Commission (*Mr. Arthur J. Sills*, Attorney General, *Mr. John W. Hayden, Jr.*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

HANEMAN, J. The facts, pleadings and issues in connection herewith are well stated by the trial judge, *Palisades Properties, Inc. v. Brady*, 79 *N. J. Super.* 327, 334–341 (*Ch. Div.* 1963), as follows:

"This consolidated action involves a dispute over the use of a tract of land which is located just south of the George Washington Bridge in the Borough of Fort Lee. Because of the complexities of the legal issues presented it is necessary, *in limine*, to relate in some detail the factual background which spawned the present controversy. The limited stipulation of facts agreed upon by the parties serves as a convenient beginning point in this regard.

In April 1927 the Borough Council of Fort Lee approved, by resolution, a map entitled 'Map of Hudson Bridge Park Estates,' which included a tract of land (herein the Estates) situated south of the George Washington Bridge and on the top of the geographic area known as the Palisades.

Directly to the south of this tract are lands now owned by the Palisades Interstate Park Commission (herein the Commission), which had been, in large part, the site of a Revolutionary War fortification. The Commission's acquisition of this property was in furtherance of a plan to restore the fortification as part of a recreational park and to help preserve the scenic integrity of the entire Palisades.

In acquiring much of its property the Commission received considerable aid in the form of substantial philanthropic contributions from John D. Rockefeller, Jr., who, by the mid-1930's had donated over 652 acres of land to the Commission at a cost in excess of 19 million dollars.

In 1952 a proposal was made to erect a multi-story apartment house development in Fort Lee within the Estates tract. The Commission, upon learning of this proposal, and in order to block the

erection of the apartment houses, offered to purchase the lots owned by the borough in the Estates.[1] Negotiations ensued and the Commission enlisted the aid of Sealantic Fund, Inc. (herein Sealantic), a charitable corporation of the State of New York founded by John D. Rockefeller, Jr.

A plan was then devised whereby the Estates area was divided into two parcels, 'A' (the western half of the Estates) and 'B' (the eastern half of the Estates), Parcel 'B' going to the Commission and Parcel 'A' to be disposed of by Sealantic for commercial development subject, however, to certain height and sign restrictions.

In December 1953 Sealantic offered to purchase all of the lots owned by the borough (137 out of 195) for $250,000. The offer was subsequently accepted. Thereafter, a dispute arose as to the necessity, advisability and validity of the transaction, and prolonged litigation ensued in the federal courts. While the exact nature of that controversy is not particularly relevant to the matter presently before the court, suffice it to say that the conflict arose, in part, out of the borough's concern over loss of ratables and a desired modification of certain height restrictions.

In June 1956 a compromise solution was agreed upon and effectuated by the litigants in the federal court action. The transactions which resulted from the agreement and which form the core of the instant litigation are as follows:

(1) The borough executed and delivered a deed to Sealantic conveying a total of 137 lots for the sum of $300,000;

(2) The borough executed and delivered a deed to Sealantic conveying 12 additional lots;

(3) Sealantic agreed to convey to the borough all of the property owned by or to be conveyed to it in Parcel 'A,' together with 10 additional lots which it had previously acquired;

(4) Sealantic agreed to convey to the Commission, without consideration, 74 lots in Parcel 'B.'

As a result of the consummation of the transactions above described, Sealantic divested itself of all property ownership in the Estates. However, the deed from Sealantic to the borough contained the following restrictions:

'The within described property is conveyed with the following restrictions which shall run with the land:

The Grantee as part of the consideration for this conveyance hereby covenants and agrees for itself, its successors and assigns with the Grantor, its successors and assigns, for the benefit of the property conveyed to the Grantor by deed bearing even date herewith and adjoining the premises hereby conveyed on the east:

1. That no building, improvement or structure of any kind or character whatsoever shall ever be constructed or maintained on the premises hereby conveyed or on the premises described in paragraph 3

---

[1] The borough had acquired these lots as a result of a tax foreclosure.

below or on any part of either thereof which shall extend in height above a horizontal plane at an elevation of 320 feet above mean sea level at the George Washington Bridge:

2. That no structure consisting of a sign, display or similar device, whether illuminated or not illuminated, shall ever be constructed or maintained on, above or east of the easterly wall of any building, improvement or other structure which may at any time be erected on the premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof and that during any period of time, no building improvement or structure (other than a sign, display or similar device) is erected or maintained on said premises or on any part thereof, no such sign, display or similar device shall ever be constructed or maintained on the premises hereby conveyed or on the premises described in paragraph 3 below or on any part of either thereof east of a line drawn parallel to and distance 100 feet easterly from Hudson Terrace, as now laid out.

3. The premises in addition to the premises hereby conveyed on which the restrictions set forth in the foregoing paragraph 1 and 2 are imposed by the Grantee are identified as:

Lots 3, 16, 18, 20, 38 and 40, Block 2; Lot 8, Block 4; Lots 8 and 21, Block 1; and Lots 1, 8, 10, 13, 14 and 16, Block 3, all as shown on a certain map entitled: "Map of Hudson Bridge Park Estates, Fort Lee Borough, Bergen Co., N. J." filed in the Bergen County Clerk's Office on May 11, 1927, as Map No. 2262.'

Simultaneous with the execution and delivery of the deeds, the borough executed a separate instrument, captioned 'Declaration of Restrictions and Covenants,' by which it, in effect, iterated the restrictions and convenants contained in the deed from Sealantic.

The aforementioned height and sign restrictions were imposed by the conveyance and the 'Declaration' upon 15 lots within the Estates, title to which was in the borough from the outset and at no time in Sealantic. Thus, following the 1956 transactions, the borough owned 100 lots in the Estates upon which height and sign restrictions were imposed. Sealantic, in return, was content in the knowledge that its avowed purpose of preserving the scenic beauty of the Palisades was protected through the restrictions imposed upon the lots in Parcel 'A.'

The next matter of any consequence occurred on March 18, 1959, when, following a duly advertised offer, 96 of the 100 lots owned by the borough were sold to an agent of Palisades Properties, Inc. (herein Properties) for $128,500. The other four lots owned by the borough were sold to the Port of New York Authority and are not involved in this action.

At the time of the 1956 agreement between Sealantic and Fort Lee, and at the time of the March 1959 sale, these 96 lots were in an 'R-4' zoning district which limited buildings to 35 feet or 2½ stories in height. In April 1959 the borough's zoning ordinance was amended, pursuant to an express condition in the offer of sale, changing the zoning district to 'C-3' and thereby increasing the height limitation to 96 feet or 8 stories.

After Properties purchased the 96 lots from the borough it then proceeded to obtain the only privately held lots in the Estates (13 in number)—none of which was expressly subject to the 1956 height and sign restrictions. In May 1961 Properties also sought and obtained from the borough a vacation of two paper streets in the Estates area, viz., Cliff Avenue and Old Fort Boulevard. Properties' avowed purpose in purchasing the lots in question and in seeking a vacation of the paper streets which abutted thereon was to allow it ample space upon which to construct a motor hotel.

It is undisputed that as early as 1957, inquiries had been made by Properties' parent affiliate, Marriot Motor Hotels, Inc., of both the Commission and Sealantic regarding a possible waiver of the height and sign restrictions. This approach was taken because Properties contemplated the erection of a tower, as part of its overall motel complex, which would exceed the applicable height restriction. Since the Sealantic-Fort Lee agreement was consummated in the context of height restrictions and an intention to maintain the scenic beauty of the Palisades area, the attempts by Properties to obtain some sort of waiver were to no avail. However, the testimony and exhibits did indicate certain discussions which tended to reflect a willingness on Sealantic's part to raise the restrictions to 354 feet.

In July 1962, after negotiations had failed, Properties filed an application for a building permit. The filed plans for its proposed motel complex revealed that it would be located upon the lots expressly restricted by Sealantic originally, upon the lots acquired by Properties from private persons, and upon the vacated streets. None of the structures depicted on the plans filed by Properties exceeded the 320-foot height restriction imposed by the Sealantic-Fort Lee agreement of 1956.

Prior thereto, in January 1962, Properties instituted an action to quiet title to its property, asking the court to determine the extent and scope of the 1956 restrictions. This suit was prompted by the prior course of negotiations between Properties, the Commission and Sealantic, and their failure to arrive at a satisfactory solution. The major points of conflict revolved about the scope of the restrictions insofar as the privately purchased lots were concerned, the legality of the vacation of Cliff Avenue and Old Fort Boulevard, and the validity of the 1959 amendment to the Fort Lee zoning ordinance. The major contestants were Properties and the Commission. Fort Lee assumed a neutral position, and several other named defendants were merely concerned with the effect of the street vacations upon their rights of ingress and egress.

Four months later Sealantic filed a separate action setting forth much of the background previously discussed and charging Properties and the borough with a scheme to circumvent the 1956 Sealantic-Fort Lee agreements. More specifically, Sealantic alleged that Properties' plan to erect a multistory tower upon that portion of their property which was acquired from private owners and the street vacations would, if effectuated, substantially impair the scenic beauty and natural skyline

of the Palisades and thereby deprive Sealantic of its rights bargained for under the 1956 agreement with Fort Lee. Sealantic demanded, *inter alia*: (a) a permanent injunction against violation of the height and sign restrictions on land expressly covered by the 1956 agreement; (b) a permanent injunction against the use of specifically restricted lands in connection with a use of other lands violating the restrictions; (c) a declaration that the restrictions applied to all properties formerly within the control of Fort Lee, including the vacated paper streets; (e) a decree setting aside the actions of Fort Lee in amending its zoning ordinances and vacating its streets to permit the erection of edifices which would violate the restrictions; (f) a permanent injunction restraining and enjoining Fort Lee from doing any other affirmative act so as to permit such violations; and (g) reformation of the 1956 agreements and deed so as to 'set forth the true intent of the parties' thereto, and enjoining any violation of the agreements and deed as reformed.

Properties' answer, while denying the allegations of inequitable conduct, stated that 'it admits that this defendant *hopes to erect* a structure on its *unrestricted property* which will be of a height in excess of the restrictions' set forth in the 1956 agreements between Sealantic and Fort Lee. (Emphasis added)

After the cases were consolidated and the issues joined, Properties, as noted earlier, filed its plans and sought a building permit. Thereafter, on August 8, 1962 this court signed a temporary restraining order enjoining the borough and its building inspector from approving or issuing a builder's permit or other official approval for excavation, construction or other building activity upon the property in question.

On August 24, 1962 Properties was enjoined *pendente lite* from further applying for or taking any action seeking approval of a building permit or other official approval concerning building activity upon the property described in their July application, and Fort Lee and its building inspector were enjoined from issuing any such approval. A motion to vacate the restraints was subsequently denied and the matter proceeded to trial.

Before embarking upon a consideration of the legal issues in this case one additional observation is necessary. While the present plans submitted by Properties do not contemplate the erection of any structure in excess of the 320-foot height and sign restrictions, all counsel have agreed, as reflected by the pretrial order in this matter, that the court should dispose of the propriety not only of the present building plans, but future plans as well, with a view to avoiding a succession of actions arising from the filing of new plans. To this end, the court will assume that Properties intends to erect a structure upon its privately acquired lots which, if located upon the lots conveyed by Sealantic to Fort Lee, would admittedly be in violation of the height and sign restrictions."

In the trial court the matter was submitted on a stipulation of facts and oral testimony adduced by plaintiffs. Judgment

was entered for Properties, 79 *N. J. Super.* 327 (*Ch. Div.*
1963), and Sealantic and the Commission appealed to the
Appellate Division. Before argument there, this Court certi-
fied the appeal on application. *R. R.* 1:10–1A.

Reduced to a simple statement, the issue here is whether
Properties may erect a "building improvement or structure"
or a "sign, display or similar device" to an elevation in excess
of 320 feet above mean sea level at the George Washington
Bridge (to an elevation of 96 feet at site ground level) on
any of the 13 lots presently owned by it which are not encum-
bered by the deed restrictions emanating from the June 7,
1956 agreement between Fort Lee and Sealantic, or on the
vacated streets. In order to highlight the particular facts
involved on this appeal a map of the tract of land in issue
here follows:

From the above plotting it is seen that in Parcel A, consist-
ing of a total of 117 lots, 100 are subject to the restrictive
covenants. Fifteen scattered lots being in private ownership,
and not subject to the Sealantic-Fort Lee agreement, remain

unrestricted. Two lots were vested in the Port of New York Authority (Port Authority) under a reconveyance agreement. Of the 78 lots in Parcel B title to 74 became vested in the Commission, and the remaining four continued in private ownership. Properties thereafter acquired title to all of the restricted lots (except four which had been previously conveyed to the Port Authority) and to 13 of the privately owned unrestricted lots in Parcel A. It acquired no title to any lots in Parcel B.

By the April 15, 1959 amendment to the zoning ordinance, changing the classification from an R-4 district to a C-3 district, Parcels A and B, together with the lands immediately adjacent to the north extending to the George Washington Bridge, and less than half an acre of contiguous property to the west of Hudson Terrace (which plays no part in our conclusion), were placed in the C-3 limited business district. The land owned by Properties in this new district constitutes about one-third of its total area, most of the balance being owned by the Commission. The building uses permitted in a C-3 district which are not permitted in an R-4 district are as follows: retail business establishments, banks, professional or business offices, fraternal, recreation, athletic or social clubs, telephone exchanges, and six-story apartment houses. Motels are expressly prohibited in a C-3 district, but Fort Lee has declared its intention to further amend the ordinance to permit the construction of motels to accommodate Properties. Buildings in the C-3 district may be 96 feet high but must be set back 10 feet from the front and 8 feet from the rear property line.

 As part of the proposed motel complex, a 96-foot highrise was planned for lots 51 through 54 in block 286—the only group of four contiguous unrestricted lots in Parcel A. In an effort to enlarge this available unrestricted plot of land, with the expressed purpose of making feasible the construction of a tower restaurant appurtenant to its proposed motel, Properties requested the vacation of Cliff Avenue and part of Old Fort Boulevard. Both of these were paper streets, 60 feet

in width. The vacation ordinance was adopted on May 3, 1961. As a result of this vacation the public easement was terminated and the abutting owners became vested with the absolute fee to the center line of the streets. *Cf. Highway Holding Co. v. Yara Engineering Corp.*, 22 *N. J.* 119, 126 (1956). In this manner what had theretofore been Blocks 285, 286 and 287, separated by Old Fort Boulevard and Cliff Avenue, became a solid tract owned by Properties, it having title to the lands on both sides of said streets.

Prior to the street vacation ordinance and subsequent to the zoning ordinance amendment which placed the tract in question in the C-3 district, the unrestricted land available in lots 51 through 54 for building purposes was of the dimensions of either 22 by 200 feet or 40 by 182 feet, depending upon whether they should be deemed fronting on Old Fort Boulevard or Cliff Avenue (setback requirements in C-3 district, as above noted, being 10 feet from the front line and 8 feet from the rear line). The effect of the vacation of these streets was to make available for the erection of the proposed high-rise a plot of unrestricted land measuring 70 by 212 feet. This eventuated from the destruction of the frontage on Old Fort Boulevard and Cliff Avenue, leaving only the 20-foot sides of Lots 51 and 53 facing Hudson Terrace with a street frontage subject to setback requirements, and from the vesting of the absolute unrestricted fee in Properties to the 30-foot strip abutting the 200-foot frontage in the road bed of Cliff Avenue and the 40-foot frontage of Old Fort Boulevard. The area thus made available for use in the proposed construction of a 96-foot-high building was more than doubled.

I.

We first consider the argument of Sealantic and the Commission that the cumulative effect of the zoning amendment and the street vacation, in light of the 1956 agreement between Fort Lee and Sealantic, exposes a course of bad faith on the part of Fort Lee which equity will prevent. Fort Lee and Properties urge in opposition to that argument that the

Fort Lee-Sealantic contract contains no express promise that Fort Lee will impose like restrictive covenants upon any lots to which it might obtain title subsequent to the date of that contract, or that it will not permit any buildings of a height exceeding 320 feet above mean sea level at the George Washington Bridge, on privately owned lots in Parcel A. They conclude that this Court has no power to rewrite that contract by supplying terms of that tenor.

However, under general contract law terms may be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to specifically express them because of sheer inadvertence or because the term was too obvious to need expression. 17 *Am. Jur. 2d, Contracts,* § 255, *p.* 651 (1964); 4 *Williston on Contracts,* § 610B (*3d ed.* 1961). In every contract there is an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." 5 *Williston on Contracts* § 670, *pp.* 159–160 (*3d ed.* 1961). Where fairness and justice require, even though the parties to a contract ·have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such a result when it is apparent that it is necessarily involved in the contractual relationship. *Fenning v. American Type Founders,* 33 *N. J. Super.* 167, 176–177 (*App. Div.* 1954). See also 3A *Corbin on Contracts* § 653 (1960); 4 *Williston on Contracts, supra,* § 610B. In *Wood v. Lucy, Lady Duff-Gordon,* 222 *N. Y.* 88, 118 *N. E.* 214 (*Ct. App.* 1917), Justice (then Judge) Cardozo said (118 *N. E.,* at *p.* 214):

"The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed * * *."

Thus, although not specifically expressed in a restrictive covenant, a grantor in a deed will not be permitted to derogate from his own grant by doing anything on the adjacent soil which will destroy the object of such a grant. *Buck v. Adams*, 45 *N. J. Eq.* 552, 556 (*Ch.* 1889); *Gawtry v. Leland*, 31 *N. J. Eq.* 385 (*Ch.* 1879).

Under the zoning ordinance as it existed at the time of the Fort Lee-Sealantic agreement no building could be erected upon the lots remaining in private ownership exceeding 35 feet. By the amendment to the zoning ordinance and the passage of the vacation ordinance, Fort Lee made possible the construction of a structure on Lots 51 through 54 to a height of 96 feet. It is apparent that at the time the agreement was entered into neither Sealantic nor Fort Lee contemplated that such action would or could be taken. Clearly, the intendment of that agreement, as disclosed by the negotiations and preceding litigation, was the preservation of the scenic beauty of the Palisades, undefiled by buildings rising above the summit thereof. This was capable of accomplishment in Parcel A only by the imposition of restrictive covenants, irrevocable by the unilateral action of Fort Lee, on the lands then owned by it. Although verbally unexpressed, implicit in this agreement was the understanding that neither party by its affirmative act would assist a third party in frustrating the contemplated objective of the contract in derogation of the benefits sought to be obtained.

Municipalities, like individuals, are bound by principles of fair dealing, *Hankin v. Hamilton Twp. Bd. of Education*, 47 *N. J. Super.* 70, 78 (*App. Div.* 1957). Equitable principles of estoppel will be applied against municipalities "where the interests of justice, morality and common fairness clearly dictate that course." *405 Monroe Co. v. City of Asbury Park*, 40 *N. J.* 457, 463 (1963); *Gruber v. Mayor and Tp. Com. of Raritan Tp.*, 39 *N. J.* 1, 13 (1962); *Tremarco Corporation v. Garzio*, 32 *N. J.* 448, 458 (1960); *Vogt v. Borough of Belmar*, 14 *N. J.* 195, 205 (1954). While the zoning amendment and street vacation, in another setting,

might have been valid exercises of municipal power, they must be viewed in the light of the present factual context, in order to ascertain the quality of those acts. Fort Lee, by these ordinances, breached the spirit and intent, if not the letter, of the agreement with Sealantic. This conduct violated the implied covenant of good faith and fair dealing, derogated from the benefits flowing to Sealantic from the restrictive covenants voluntarily assumed by Fort Lee, and therefore constituted inequitable conduct which this Court will not sanction.

Properties contends, however, that Fort Lee does not have the power to restrict the use of privately owned property pursuant to an agreement with Sealantic or to agree to insure the integrity of the skyline of the Palisades through its power of zoning. Such action, it argues, would be invalid as "contract zoning," citing *Houston Petroleum Co. v. Automolive Products Credit Ass'n*, 9 *N. J.* 122, 129–130 (1952); *V. F. Zahodiakin, etc., Corp. v. Zoning Bd. of Adjustment, Summit*, 8 *N. J.* 386, 394 (1952).

In *Houston*, 9 *N. J.*, at *p.* 129, the Court said that "[c]ontracts thus have no place in a zoning plan and a contract between a municipality and a property owner should not enter into the enactment or enforcement of zoning regulations." In *Zahodiakin*, the Court stated (8 *N. J.*, at *pp.* 394–395):

"Zoning is an exercise of the police power to serve the common good and general welfare. It is elementary that the legislative function may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts. The use restriction must needs have general application. The power may not be exerted to serve private interests merely, nor may the principle be subverted to that end. *Brandon v. Montclair, supra* [124 *N. J. L.* 135 (*Sup. Ct.* 1940) affirmed 125 *N. J. L.* 367 (*E. & A.* 1940)]; *Appley v. Township Committee of the Township of Bernards*, 128 *N. J. L.* 195 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 73 (*E. & A.* 1942); *Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949); *Speakman v. Mayor and Council of North Plainfield*, 8 *N. J.* 250 (1951). It was not within the province of the local authority here to vest in the landowner by contract a special privilege or exemption to use its premises in violation of the general rule binding upon all other landowners within the zone. *Lynch v. Hillsdale*, cited

*supra* [136 *N. J. L.* 129 (*Sup. Ct.* 1947) affirmed 137 *N. J. L.* 280 (*E. & A.* 1948)]; *Beckman v. Township of Teaneck,* 6 *N. J.* 530 (1951). The purported contract was *ultra vires* and all proceedings to effectuate it were *coram non judice* and utterly void. *Bauer v. City of Newark,* 7 *N. J.* 426 (1951)."

With these general statements we are in accord. That principle is founded upon the doctrine that a municipality may not contract away its legislative or governmental powers. However, a municipality possesses not only such rights as are granted to it in express terms by the Legislature, but as well such other powers as "arise by necessary or fair implication, or are incident to the powers expressly conferred, or are essential to the declared objects and purposes of the municipality." *E. g., Edwards v. Mayor, etc. of Borough of Moonachie,* 3 *N. J.* 17, 22 (1949). Accordingly, the above doctrine is subject to the limitation that where a municipality has incurred an obligation which it has the power to incur it cannot escape that obligation by asserting that it is merely exercising the police power delegated to it. Such an exception is necessarily appended to every such municipal contract. *Cf.* 2 *McQuillin, Municipal Corporations,* § 10.38 (*3d ed.* 1949).

In the case *sub judice* the municipality, by virtue of *N. J. S. A.* 40:60–26, had the express statutory power to execute the Fort Lee-Sealantic contract imposing the restrictive covenants. *Cf. Oldfield v. Stoeco Homes, Inc.,* 26 *N. J.* 246, 261-62 (1958); *Hendlin v. Fairmount Const. Co.,* 8 *N. J. Super.* 310, 339 (*Ch. Div.* 1950); *N. J. S. A.* 40:60–51.2. The purpose of that agreement was not to restrict the municipality from further zoning. The sole objective was the imposition of restrictive covenants on specifically described parcels of land. From that contract flowed the same duty and obligation that would be incurred by individuals and private corporations under similar circumstances, *i. e.,* the duty not to take any affirmative action which would destroy the fruits thereof. See *Borough of West Caldwell v. Borough of Caldwell,* 26 *N. J.* 9, 22 (1958); *Peejay Corp. v. City of Newark,* 136 *N. J. Eq.* 31, 34 (*E. & A.* 1944). Under such circum-

stances, barring Fort Lee from taking affirmative governmental or legislative action which would constitute a breach of its agreement is not to be regarded as the proscribed contracting away of such powers. It cannot escape the obligations incurred by the Sealantic agreement under the guise of police power. Sealantic and the Commission are therefore entitled to injunctive and declaratory relief against this inequitable conduct.

## II.

We consider additionally the narrower charge by Sealantic and the Commission that the zoning amendment is invalid as spot zoning. *R. S.* 40:55–32 requires that "regulations shall be in accordance with a comprehensive plan" designed to promote purposes related generally to the health, safety and welfare of the community. See *Conlon v. Bd. of Public Works, Paterson*, 11 *N. J.* 363, 366 (1953) ; *Borough of Cresskill v. Borough of Dumont*, 15 *N. J.* 238, 249 (1954). Spot zoning is the antithesis of such planned zoning. Accordingly, where there is an allegation of spot zoning the test is whether the particular provision of the zoning ordinance is made with the purpose or effect of furthering a comprehensive scheme or whether it is designed merely to relieve a lot or lots from the burden of a general regulation. *Conlon v. Bd. of Public Works, Paterson, supra*; *Borough of Cresskill v. Borough of Dumont, supra*; *Esso Standard Oil Co. v. Town of Westfield*, 33 *N. J. Super.* 324, 331–332 (*App. Div.* 1954) ; *Zaehring v. Long Beach Tp.*, 56 *N. J. Super.* 26, 34 (*Law Div.* 1959). *In Kozesnik v. Montgomery Twp.*, 24 *N. J.* 154, 173 (1957), this Court stated:

"If the purpose is solely to serve the private interests of the owner, there is a perversion of power, but if the intention is to further the welfare of the entire municipality as part of a comprehensive plan (and we have said that a legislative finding to that effect must here be upheld), it is of no moment that private interests are simultaneously benefited."

The amendment is to be assayed, for motivation and purpose, in the context of local zoning history and the supposed need deemed relevant to the exercise of the zoning function. *Raskin v. Town of Morristown*, 21 *N. J.* 180, 184 (1956). The mere fact that an ordinance affects only a single lot does not necessarily show that it is deficient in respect to the above statutory requirement. Nor is the ownership of the lot or its size the controlling test of spot zoning. *Kozesnik v. Montgomery Twp., supra*, 24 *N. J.*, at *p.* 173; *Conlon v. Bd. of Public Works, Paterson, supra*, 11 *N. J.*, at *p.* 366.

The facts in the instant case must be examined with the above precepts in mind. Superficially, the creation of a district the size and location of that established by the zoning amendment in question might not appear to be spot zoning. When the actual effect of this change upon the lands within this area is analyzed, however, it becomes manifest that the amendment violates the statutory mandate.

There is no contest as to the validity or enforceability of the Fort Lee-Sealantic restrictive covenants. That the restrictions are viable is evidenced by this litigation. Nor are these restrictions affected by a change in the zoning ordinance. *Scillia v. Szalai*, 142 *N. J. Eq.* 92, 98 (*Ch.* 1948). *Cf. Protomastro v. Bd. of Adjustment of City of Hoboken*, 3 *N. J.* 494, 500 (1950), reversing 3 *N. J. Super.* 539 (*Law Div.* 1949).

The territory encompassed within the newly created zone consists, as above stated, of Parcels A and B of the Estates and lands to the north thereof approximately one-half the size of the combined acreage of Parcels A and B. The lands in Parcel A which are subject to the Fort Lee-Sealantic agreement could not be used to construct a building over 320 feet above mean sea level at the George Washington Bridge, by virtue of the restrictive covenants. Title to Parcel B (except for four lots) and the said lands to the north, which together constitute some two-thirds of the area of the newly created zone, is in the Commission. The lands owned by the Commission could not be utilized for the uses permissible under the zoning ordinance because of the statutory limitation upon

the purposes for which the Commission may acquire and use land. *R. S.* 32:17–6 provides:

"3. All lands the title to which is hereby transferred to or shall hereafter be owned by the commission shall be and continue under the jurisdiction of the commission and shall be used only for public park purposes * * *."

Additionally, these lots in Parcel B were obtained by the Commission from Sealantic with notice of the Fort Lee-Sealantic agreement, and a grantor in a deed will not be permitted to derogate from his own grant by doing anything on adjacent soil which will destroy the object of the grant. *Buck v. Adams, supra,* 45 *N. J. Eq.* 552, at *p.* 556; *Gawtry v. Leland, supra,* 31 *N. J. Eq.* 385. Of the 195 lots in Parcels A and B only 19 — less than 10% — are thus not subject, directly or indirectly, to the restrictive covenants limiting building heights to 320 feet. The 19 lots so usable are scattered throughout Parcels A and B in nine separate groups and are of the following approximate dimensions: two single lots 20 feet by 100 feet, one single lot 20 feet by 150 feet, one pair 20 feet by 200 feet, two pairs 40 feet by 100 feet, one pair 40 feet by 200 feet, one group of four 80 feet by 100 feet, one group of four 40 feet by 200 feet. Although the ordinance theoretically makes these 9 groups of lots available for a 96-foot-tall structure, it is hardly conceivable that the single lots and pairs, of the above dimensions, could be utilized for the erection of a building designed for any of the permissive uses to such a height. It is thus seen that only two groups of four lots each, separated by approximately 500 feet, might be employed for such purpose. Doubt is cast on the feasibility of constructing such a building even on either of these two groups of lots by Properties' position that Old Fort Boulevard and Cliff Avenue must be vacated so as to obtain additional unrestricted land in order to make practical the construction of a tower restaurant approaching that height.

▇▇▇ The foregoing analysis of the practical effect of the zoning amendment, coupled with the action of Fort Lee in vacating Old Fort Boulevard and Cliff Avenue to accommodate Properties in its avowed purpose to erect a building over 320 feet above mean sea level at the George Washington Bridge, on Lots 51 through 54, makes it patent that the effect of, and the overriding motive behind, the zoning change was the release of these particular lots from the burden of the 320-foot restriction. Had all or part of the 19 lots in private ownership, scattered as they are through Parcels A and B, been singled out by ordinance for a building height treatment different from that permitted in the balance of the zone, there could be no doubt that such action would constitute spot zoning. Such an end result should not be countenanced, even though the face of the ordinance does not bespeak that conclusion. A contrary rationalization would permit Fort Lee to do indirectly what it cannot do directly. Viewed in the light of the practical effect of the zoning amendment and of the factual complex preceding, surrounding and succeeding the amendment, it is clear that the intent, motive, purpose and effect thereof were not the furtherance of a comprehensive plan but were solely to relieve Properties, as owner of Lots 51 through 54, from the burden of the 320-foot height restriction so as to permit the construction of a tower thereon exceeding that height. Hence, it follows that that aspect of the zoning amendment dealing with permissive heights within the district is in essence spot zoning. This is not to say that the change in use from residential to commercial is not warranted, just that, under the facts herein, changing the permissive heights is factually unjustified. It follows that the entire amendment is therefore invalid as spot zoning.

## III.

▇▇▇▇ We also deal with the contention that the vacation of Cliff Avenue and Old Fort Boulevard is invalid. It is clearly established that a municipality may vacate a street

where such action serves the general public interest. The fact that one of the reasons for vacating a street is to accommodate an abutting owner does not of itself invalidate such an ordinance if the public interest is also promoted by so vesting the absolute fee in the abutting owner. *Kean v. City of Elizabeth*, 54 *N. J. L.* 462, 466 (*Sup. Ct.* 1892), affirmed 55 *N. J. L.* 337 (*E. & A.* 1893); *Sherwood v. City of Paterson*, 88 *N. J. L.* 456, 458 (*Sup. Ct.* 1915); *Downs v. Mayor, etc., South Amboy*, 116 *N. J. L.* 511 (*E. & A.* 1936); *Con Realty Co. v. Ellenstein*, 125 *N. J. L.* 196, 199–200 (*Sup. Ct.* 1940); *Pyatt v. Mayor and Council of Dunellen*, 9 *N. J.* 548, 553–554 (1952). See generally Cunningham and Tischler, "Dedication of Land in New Jersey," 15 *Rutgers L. Rev.* 377, 410–413 (1961).

The question here, however, is whether the municipality of Fort Lee should have imposed a 320-foot height limitation as a condition to its vacation of the streets in question.

In *Hammer v. City of Elizabeth*, 67 *N. J. L.* 129, 131 (*Sup. Ct.* 1901), the court said:

"This is not an ordinance vacating Myrtle street. The ordinance itself states that it is passed under the act to amend the charter of Elizabeth, the supplements thereto, and the general laws of the state; but our attention has not been called to, nor do we know of any, law, general or special, authorizing the passage of an ordinance vacating streets under conditions similar to those contained in the ordinance under review, whereby the ordinance may become effective upon the performance of certain conditions. There are statutes authorizing the passage of ordinances vacating streets when certain conditions appear to exist, after certain preliminaries have been taken; * * *."

Research has disclosed only two other reported cases involving a conditional street vacation. In *Downs v. Mayor, etc., South Amboy, supra,* the Court had under consideration a conditional vacation but the question of the legal efficacy thereof was apparently not raised. In *Pyatt v. Mayor and Council of Dunellen, supra,* the plaintiff raised that issue, relying upon *Hammer,* but the Court did not find it necessary to pass on the question. If *Hammer* stands for the proposition that a

municipality may never append a condition to a street vacation we conceive that it reached an erroneous conclusion.

While the vacation must be for the public benefit, realistically, it is generally instigated by the abutting owner to enable him to use the land untrammelled by the public easement. The request for such a vacation by the owner is usually accompanied by a statement of the function to which the land is to be put. As we have already noted, a municipality has the implied powers necessarily incidental to the execution of expressly granted powers. It is illogical to say that a municipality may accede to a request for a street vacation to accommodate an abutting owner but is powerless to exact positive compliance with his avowed intended use of the roadbed when it is discharged from the public easement. We hold, therefore, that a municipality has the power, and under certain circumstances the duty, to append a condition to a street vacation to assure that the land thus relieved of the public easement will be employed for the purposes upon which the municipality based its conclusions that it was for the general public interest. It follows that a municipality has as well the general power and such duty to append a condition to a street vacation when it is necessary to serve the general public interest. *Cf. Cohen v. Borough of Fair Lawn,* 85 *N. J. Super.* 234, 236–237 (*App. Div.* 1964); *State v. Farmland-Fair Lawn Dairies, Inc.,* 70 *N. J. Super.* 19, 24 (*App. Div.* 1961). See also *Black v. Town of Montclair,* 34 *N. J.* 105, 107 (1961); *Andrews v. Ocean Twp. Board of Adjustment,* 30 *N. J.* 245, 248 (1959).

In the matter *sub judice,* it is apparent that it was in the general public interest for Fort Lee to abstain from taking any affirmative action which would serve to frustrate the purpose and intent of its contract with Sealantic. Accordingly, Fort Lee had a duty to vacate Cliff Avenue and Old Fort Boulevard only upon condition that the vacated portion be used in conformity and compliance with the restrictive covenants imposed by its agreement with Sealantic. The unconditional vacation of these streets was therefore invalid.

Reversed and remanded for the entry of a judgment consistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.