**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0392-19T4

SEVEN STAR PROPERTIES,
LLC and TKK BROADWAY
MANAGEMENT, LLC,

      Plaintiffs-Appellants,

v.

EDGEWATER 880
ASSOCIATES, LLC, 880
RIVER ROAD ASSOCIATES,
FRED A. DIABES, DANNY
DIABES, RE GLOBAL
CONSULTING, MARINER'S
BANK, and PAUL KEATING,

      Defendants-Respondents.

_____

      Submitted September 29, 2020 – Decided  October 8, 2020

      Before Judges Sabatino and DeAlmeida.

      On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000070-17.

      The Basil Law Group, PC, attorneys for appellants (Robert J. Basil and David A. Cohen, on the briefs).

Robert P. Travers, attorney for respondents Edgewater 880 Associates, LLC, 880 River Road Associates, Fred A. Diabes, Danny Daibes and RE Global Consulting.

Respondents Mariner's Bank and Paul Keating have not filed a brief.

PER CURIAM

This appeal involves a dispute over the allocation of a $852,100 deposit a buyer made in connection with a commercial real estate sale that failed to close. The buyer was unable to obtain financing to make the purchase, and the seller sought to retain the deposit as liquidated damages for the buyer's breach.

After an evidentiary hearing, the Chancery judge determined that the buyer had not acted in good faith, causing the court and the seller to continue to believe for nearly a month that a mortgage commitment was still in place when, in fact, the commitment had already lapsed or been withdrawn. Upon considering the testimony of competing expert appraisers, the judge found the subject property was worth significantly less than the contractual sale price. Accordingly, the judge allocated $736,900 of the deposit to the seller to compensate it for the loss of the benefit of the bargain, and ordered the $115,200 remainder to be returned to the buyer.

The buyer now appeals, arguing the judge's findings are erroneous and that it is entitled to a return of the full amount of the deposit. For the reasons that follow, we affirm the judge's decision.

I.

In December 2016, plaintiff Seven Star Properties, LLC ("Seven Star") and its principals entered into an agreement with defendant Edgewater 880 Associates, LLC ("Edgewater 880") for the exchange and sale of two properties.[1] In particular, the original agreement contemplated the sale of property in Tenafly owned by Seven Star in exchange for the sale of the property that Edgewater 880 owned in Edgewater.

The Edgewater property, which is the parcel at issue in this dispute, is a mixed-use structure built in the 1980s. It contains approximately 11,300 square feet of retail space and 10,800 square feet of office space.

Under the terms of the original agreement, Edgewater 880 agreed to purchase the Tenafly property for $2,200,000, and Seven Star reciprocally agreed to purchase the Edgewater property from Edgewater 880 for $8,521,000, with the $2,200,000 proceeds from the sale of the Tenafly property applying to

---

[1] We have omitted for conciseness the names of the persons and business entities in the caption respectively associated with plaintiff Seven Star and defendant Edgewater 880.

 A-0392-19T4

the $8,521,000 purchase price of the Edgewater property. Although the original agreement stated that the "Parties" each would deposit with an escrow agent the sum of $852,100, it appears that Seven Star was the only party to pay this deposit.[2] The $852,100 sum corresponds to ten percent of the Edgewater property's sale price.

The original agreement contained various provisions pertinent to our analysis, including a Mortgage Contingency Clause, paragraph 22, and a Liquidated Damages Clause, paragraph 18. The Mortgage Contingency Clause recites, in pertinent part:

> (a) <u>The obligation of Purchaser</u> to purchase under this Contract <u>is conditioned upon issuance, on or before 45 days after a fully executed copy of this Contract is given to Purchaser or Purchaser's attorney, of a written commitment from an Institutional Lender</u> pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan, to Purchaser, at Purchaser's sole cost and expense, of $4,771,000 for a term of at least 15/30 years (or such lesser sum or shorter term as Purchaser shall be willing to accept) at the prevailing fixed or adjustable rate of interest and on other customary commitment terms (the "Commitment"). To the extent a Commitment is

---

[2] The original agreement refers to "Parties" with a capitalized "P," and therefore a presumably defined term, but never defines it, so it is unclear which entity or entities the term "Parties" refers to. In addition, the contract variously refers at times to "Purchaser" and "Buyer" in both the singular and plural. These inconsistencies of wording do not affect our analysis.

conditioned on payment of any outstanding debt, no material adverse change in Purchaser's financial condition or any other customary conditions, Purchaser accepts the risk that such conditions may not be met; however, a commitment conditioned on the Institutional Lender's approval of an appraisal shall not be deemed a "Commitment" hereunder until an appraisal is approved (and if that does not occur before the Commitment Date, Purchaser may cancel under [sic] unless the Commitment Date is extended). Purchaser's obligations hereunder are conditioned only on issuance of a Commitment. <u>Once a Commitment is issued, Purchaser is bound under this Contract even if the lender fails or refuses to fund the loan for any reason</u>.

[(Emphasis added).]

The Mortgage Contingency Clause further addresses in section (h) the consequences of the buyer's failure to secure a mortgage:

(h) There shall be no automatic waiver of the mortgage contingency clause. If at the conclusion of the mortgage contingency period (as may be extended by mutual agreement), Buyer has not obtained a mortgage commitment, then either party shall be permitted to cancel this contract or Buyer may waive the contingency and proceed to closing. <u>If [the] mortgage commitment is withdrawn or contains conditions that the Buyers, in good faith, are not able to meet or is subsequently retracted by the Lender through no fault of the Buyers, the mortgage contingency clause shall be deemed unsatisfied and Buyer may cancel the Contract of Sale with a return of all deposit monies</u>.

[(Emphasis added).]

A-0392-19T4

In a separate paragraph of the original agreement, the Liquidated Damages Clause provides:

> (a) If either Purchaser shall default in the performance of any of its obligations hereunder, Parties shall have the right, as its sole and exclusive remedy, to receive and retain the Deposit, as and for liquidated damages, it being the understanding and agreement of the parties hereto that the actual damages, costs, and expenses sustained by Parties in the event of no closing are difficult, if not impossible, to ascertain, and that the amount of the Deposit is reasonable.

> [(Emphasis added).]

It is undisputed that Seven Star paid the deposit sometime after execution of the contract in December 2016 and before March 2017. According to Edgewater 880, it terminated the original agreement in February 2017 because Seven Star had failed to secure financing in the allotted time.

Thereafter, in March 2017, Seven Star and a related entity filed an action in the Chancery Division against Edgewater 880 and related entities, seeking a declaratory judgment and specific performance concerning the agreement. Seven Star alleged that Edgewater 880 and its related entities had committed an anticipatory repudiation of the original agreement, by allegedly terminating the original agreement prematurely before the expiration period specified in the Mortgage Contingency Clause.

A-0392-19T4

Edgewater 880 and its related parties denied having cancelled the contract prematurely. Meanwhile, the trial court dismissed certain "bank co-defendants" that Seven Star had named in the lawsuit, because there was no evidence those bank defendants ever had made an enforceable written loan commitment to Seven Star.[3]

Following negotiations between the parties, Seven Star moved to compel an alleged settlement. After Edgewater 880 filed opposition, the trial court scheduled a plenary hearing to ascertain whether a settlement had, in fact, been attained.

On September 14, 2018, the attorney who was then representing Seven Star in the litigation,[4] sent a letter to the trial judge detailing the witnesses to appear in the upcoming plenary hearing. The letter from counsel specifically asserted that Seven Star is "ready, willing and able to close title in accordance with the underlying contract." The letter further asserted that Seven Star has

---

[3] Seven Star does not contest on appeal the trial court's dismissal of the bank defendants.

[4] Seven Star substituted a different litigation attorney in December 2018, and he is now representing Seven Star on this appeal.

"been holding a $5.4 million commercial mortgage commitment from Woori American Bank."[5]

On October 9, 2018, the plenary hearing commenced to address whether a settlement had been reached between the parties. While the parties convened in the judge's chambers during a recess, a settlement agreement was reached. The settlement, in essence, involved eliminating the "swap" for the Tenafly property and instead having Edgewater 880 take back a $2.2 million second mortgage on the sale of the Edgewater parcel. Certain terms of the settlement were then orally placed on the record in open court and later memorialized in a November 14, 2018 order.

The November 14, 2018 order reflects these agreed-upon revised terms:

> Plaintiff, Seven Star Properties, LLC, will purchase and the Edgewater 880 Associates, LLC ("Defendant"), will sell the subject property known as 880 River Road, Edgewater, New Jersey, for $8,521,000.00 ("Purchase Price"). Edgewater 880 Associates, LLC, will provide a $2,200,000.00 loan secured by a note ("Note") and mortgage ("Second Mortgage") to Plaintiff, Seven Star Properties, LLC, as part of the Purchase Price. . . . There shall be no prepayment penalty and the sale of the property is "As Is" subject to the existing tenants.

---

[5] Woori American Bank is a separate entity from the bank defendants and is not a party to this action.

After the settlement was placed orally on the record on October 9, Edgewater 880 and its real estate professionals took steps to prepare for the anticipated closing.  Among other things, Edgewater 880 obtained engineering surveys and prepared a subdivision map and legal descriptions, proposed interest rate and payment calculations for the second mortgage it was extending, provided the buyer with updated rent rolls for the property's tenants, and obtained "estoppel letters" from various tenants.  Between October 17 and November 19, a paralegal with Edgewater 880's law firm sent emails on nearly a daily basis to Seven Star's litigation attorney or its separate real estate attorney, prodding them to move the transaction forward.  During this time Seven Star gave no indication of any problem with the first mortgage commitment.

Ultimately, on November 19, the seller's paralegal requested "ASAP" a copy of the mortgage commitment from Seven Star's real estate attorney.  In a responding email later that day, Seven Star informed Edgewater 880, for the first time, that "we don't have it [the mortgage commitment] yet."  Incredulous, the paralegal asked in a responding email, "How are we going to close on the 30th [of November]? What bank is your client getting a mortgage from?"  The paralegal also reminded Seven Star's real estate attorney that Seven Star had "made numerous representations to [her] office and the Court that they already

have a mortgage commitment." The Seven Star real estate attorney tersely responded by email on November 20, "They did have one but it obviously expired."

Following these revelations, Edgewater 880 sought the court's intervention. On December 5, Seven Star's real estate attorney sent a letter to the judge and provided this explanation:

> Pending the litigation, the loan had expired and upon notice to close on this matter we contacted the previous lender but was not able to continue with the loan when we delivered updated information. The purchaser is now working with two lenders who have completed the appraisal and are advising us that we can close this matter sometime in January.

At an ensuing December 7 case management conference, the judge inquired as to whether Seven Star was ready, willing, and able to close on the purchase. Seven Star's litigation attorney responded to the judge as follows:

> COUNSEL: We were, we were [ready to close]. The lender pulled out at the last minute, we have no control over that, Judge.
>         . . . .
>
> THE COURT: Yeah but you knew that – <u>you knew that at the end of October</u>, right?
>
> COUNSEL: <u>We certainly knew it at the end of October and the minute we got that inkling, we processed two applications</u> with Pacific Bank and Sheehan [sic] Bank and pursued to refill Lori's [sic] role.

[(Emphasis added).]

On January 2, 2019, the trial court entered an order placing the $852,100 deposit into the trust account of counsel for Edgewater 880, and directing Seven Star to close on the purchase of the Edgewater property on or before January 15, 2019. The order also stated that Seven Star would be in breach of the settlement agreement should it fail to close on or before that extended deadline of January 15, and its right to purchase the property would be "declared null and void." The order further allowed Edgewater 880 to "make an application to the Court to apply all or some portion of the deposit of $852,100.00 as damages."

Seven Star did not obtain a first mortgage commitment by January 15, 2019, and thus did not close the transaction, in breach of the parties' agreement.

Both parties then made applications to receive the deposit proceeds being held in escrow. In support of its application, Seven Star submitted an appraisal report which concluded that, as of December 4, 2018, the Edgewater property had a fair market value of $8,525,000, a figure slightly above the contract price. In opposition, Edgewater 880 submitted an appraisal report which concluded that as of February 19, 2019, the fair market value of the Edgewater property was only $6,550,000, far below the contract price. According to Edgewater

11

880's expert, the decreased fair market value appears to be attributable to "six broken windows as well as water damage in the interior of the Property."

The trial court scheduled a plenary hearing "limited to the testimony" of the two appraisers. The court held that plenary hearing on May 22, 2019, and the parties thereafter submitted post-hearing briefs.

On August 28, 2019, the trial court issued an oral decision that is the subject of this appeal. The oral decision contains several key findings that are pertinent to the present appeal:

- [T]his Court finds that the parties' agreement and settlement contemplated that <u>provisions of the sale agreement</u>, including the liquidated damages provision, <u>remain in effect</u>.

- The Court finds that at all times <u>the parties agreed and understood</u> that the deposit would remain in escrow pending the closing, and <u>that if the closing was not consummated, the deposit was subject to claim by the defendant[s]</u>.

- Further, plaintiffs' argument that if the liquidated damages provision remained in place, then the mortgage contingency provision also remained in place is incorrect. <u>Plaintiffs</u> on November 14, 2018,[6] <u>represented to the Court and the defendants that they were ready, willing and able to close the transaction because their mortgage was in place</u>,

---

[6] The judge appears to have been mistaken about the date, as there was no hearing on November 14, 2018, but rather an order memorializing the settlement reached earlier by the parties after the October 9, 2018 plenary hearing.

when in fact the mortgage was no longer in place.
. . . To allow the plaintiffs to benefit from this
misrepresentation would not be equitable.

[(Emphasis added)].

Having made these determinations, the judge then turned to the enforcement of the liquidated damages claims. The judge recognized that, notwithstanding the parties' acknowledgement in the original agreement that a return of the full amount of the deposit as liquidated damages would be reasonable, New Jersey case law requires such damages to be objectively reasonable. See, e.g., Wasserman's Inc., v. Twp. of Middletown, 137 N.J. 238, 247-54 (1994). Accordingly, the judge evaluated the equities of both sides, and concluded that Edgewater 880 should retain only a portion of the deposit representing the loss of the benefit of its bargain.

Specifically, the judge adopted a capitalization rate of 6.0 percent – a figure between the experts' competing percentages of 5.50 and 6.75 percent. That 6.0% rate yielded a computation of $7,784,100 as the fair market value for the Edgewater property, a figure $736,900 less than the contract price. Based on this computation, the judge awarded $736,900 of the deposit to Edgewater 880 as damages for the buyer's breach, allowing Seven Star to retain the $115,200 remainder.

On appeal, Seven Star contends it was entitled to a return of the full deposit. It argues the trial judge erred in finding that the Liquidated Damages Clause implicitly carried over from the original agreement to the settlement agreement. Seven Star further contends the judge erred in finding that its representatives made misrepresentations to the court and Edgewater 880 about the status of the first mortgage commitment. Additionally, Seven Star maintains that it was not the proximate cause of any damages to Edgewater 880, and that the court's calculations of the property's value were flawed by utilizing an improper capitalization rate.

In response, Edgewater 880 urges that we uphold the judge's decision. It has not cross-appealed the judge's determination to return a $115,200 portion of the deposit to Seven Star.

## II.

We apply well-established principles of appellate review to the Chancery judge's decision. As a general matter, we will affirm a trial judge's findings of fact in this non-jury setting if they are supported by "adequate, substantial, credible evidence." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

14

We review de novo, however, the judge's rulings on questions of law, including the interpretation of contract terms. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011). With respect to the judicial fashioning of relief, such as the allocation of the contract deposit, we must bear in mind that a "Chancery judge has broad discretionary power to adapt equitable remedies to the particular circumstances of a given case." Marioni v. Roxy Garments Delivery Co., Inc., 417 N.J. Super. 269, 275 (App. Div. 2010) (citing Salorio v. Glaser, 93 N.J. 447, 469 (1983); Mitchell v. Oksienik, 380 N.J. Super. 119, 130-31 (App. Div. 2005)).

Applying these review standards here, we affirm the trial court's decision, substantially for the sound reasons expressed in Chancery Judge James J. DeLuca's August 28, 2019 oral opinion. We add only a few comments by way of amplification.

First, we agree with Judge DeLuca that the parties' settlement achieved at the courthouse and placed on the record on October 9, 2018 did not fully supersede the unaltered terms of the parties' original purchase-and-sale contract. The main revision of the deal was to eliminate the sale of Seven Star's Tenafly property to Edgewater 880. To offset that change in consideration, the settlement called for Edgewater 880 to take back a corresponding $2.2 million

15

mortgage on the sale of the Edgewater property. Other than various adjustments to the contract deadlines, no other material terms were altered or nullified.

The judge rightly considered the settlement to be a modification, but not a complete displacement, of the original agreement. See, e.g., Cnty. of Morris v. Fauver, 153 N.J. 80, 99 (1998). The unaltered terms of the original agreement, including the Mortgage Contingency Clause and the Liquidated Damages Clause, survived.

The settlement placed on the record in October 2018 and the corresponding order were not comprehensive real estate contracts. Additional terms were logically carried forward under the original agreement, and the record is bereft of evidence the parties intended otherwise. The settlement did not operate as a novation, as it did not add a new party, "either as obligor or obligee, who was not a party to the original duty." Carrington Mortg. Servs., LLC v. Moore, ___ N.J. Super. ___ (App. Div. 2020) (quoting Restatement (Second) of Contracts § 280 (Am. L. Inst. 1981)).

Next, we concur with Judge DeLuca that Seven Star was not entitled to a full refund of the deposit because it did not satisfy the requirements for such a refund under the Mortgage Contingency Clause. That contingency provision only entitled the buyer to get the deposit back if it acted in "good faith" should

16

the mortgage commitment be withdrawn or not timely procured in time for a closing.

The record contains ample proof – particularly the representations made by Seven Star's former counsel that it had obtained financing and was ready to close and the subsequent email exchanges with Edgewater 880's paralegal – that Seven Star both misled the court and Edgewater 880 about the ongoing actual status of the mortgage commitment. It was not until November 19 that Seven Star's real estate attorney, after being pressed repeatedly for information by Edgewater 880, abruptly informed the seller that the mortgage with Woori American Bank had fallen through.

Although the record does not disclose the exact date, Seven Star's former counsel ultimately admitted to the court that Seven Star learned in "late October" that the mortgage commitment with Woori American Bank had lapsed or been withdrawn. The first mortgage was an essential underpinning of the settlement. It was relied upon as a basis for giving Seven Star more time to close the transaction. Nearly a month went by after the parties had placed the settlement on the record before Seven Star finally admitted the mortgage commitment no longer existed and it was not prepared to close.

A-0392-19T4

Although a requirement of good faith is explicit in the original agreement, there is also "an implied covenant of good faith and fair dealing" in "every contract in New Jersey." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). The implied covenant signifies that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Ibid. (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). Long ago, the United States Supreme Court instructed:

> If, with intent to deceive, either party to a contract of sale conceals or suppresses a material fact which he is in good faith bound to disclose, this is evidence of and equivalent to a false representation, because the concealment or suppression is, in effect, a representation that what is disclosed is the whole truth.
>
> [Stewart v. Wyoming Cattle-Ranche Co., 128 U.S. 383, 388 (1888) (emphasis added).]

In a similar vein, Black's Law Dictionary defines "passive misrepresentation" as "the act of remaining silent under circumstances that make the silence seem to support a false statement's validity." Black's Law Dictionary 1152 (10th ed. 2014).

Here, the trial court had sufficient grounds to conclude that Seven Star's failure to promptly advise Edgewater 880 that the Woori American Bank

A-0392-19T4

mortgage commitment was no longer viable constituted passive misrepresentation and a lack of good faith. Until the November 19 email, Seven Star pretended that the financing was still in place, causing Edgewater 880 to pursue final steps to prepare for a closing. Such misleading silence was appropriately decried by the judge.

Although a buyer's three-to-four-week delay in obtaining a mortgage may not establish a lack of good faith in other contexts, the particular circumstances here, which arose out of a court-supervised settlement, justified the court's denial of a full refund of the deposit, and its enforcement of the Liquidated Damages Clause.

We are also satisfied that the Liquidated Damages Clause did not operate in this context as an unfair or unreasonable penalty. Wasserman's Inc., 137 N.J. at 247-54; see also Met Life Cap. Fin. Corp. v. Wash. Ave. Assocs., L.P., 159 N.J. 484, 493-95 (1999). In fact, the court arguably could have allowed Edgewater 880 to retain the full deposit without offending principles of fairness and equity. Out of an abundance of prudence, the court conducted an evidentiary hearing and duly considered the testimony of the two valuation experts.

The court had the equitable prerogative to reject the extreme positions of both experts and adopt a valuation figure that is in between their range.

With respect to the opinions of qualified experts, a trier of fact is free to accept or reject the testimony of either side's expert, in full or in part. Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div.) (citing Carey v. Lovett, 132 N.J. 44, 64 (1993)), certif. denied, 174 N.J. 193 (2002); see also Angel v. Rand Express Lines, Inc., 66 N.J. Super 77, 85-86 (App. Div. 1961) (citations omitted); Model Jury Charge (Civil) 1.13, entitled "Expert Testimony," and 1.13(B), entitled "Optional Charge in Case of Conflicting Expert Testimony." Moreover, as we already have noted, a Chancery judge has broad powers to fashion equitable relief. That authority clearly was not misapplied here. The result was not unfair to Seven Star, the breaching party.

To the extent we have not already discussed them, Seven Star's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0392-19T4