NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1218-15T2
 A-3014-15T2

MARK and KATHERINE SMITH,

 Plaintiffs-Appellants,

v.

SOUTH BRUNSWICK TOWNSHIP,
PUBLIC SERVICE ELECTRIC &
GAS COMPANY, and TRUSTEES
OF PRINCETON UNIVERSITY,

 Defendants-Respondents.
____________________________________

MARK and KATHERINE SMITH,

 Plaintiffs-Respondents/
 Cross-Appellants,

v.

SOUTH BRUNSWICK PLANNING BOARD,

 Defendant,
and

PUBLIC SERVICE ELECTRIC &
GAS COMPANY,

 Defendant-Appellant/
 Cross-Respondent.
______________________________________
 Argued May 8, 2017 – Decided May 18, 2017

 Before Judges Sabatino, Haas and Geiger.

 On appeal from Superior Court of New Jersey,
 Law Division, Middlesex County, Docket Nos.
 L-906-15 and L-907-15.

 Bruce I. Afran argued the cause for Mark and
 Katherine Smith, appellants in A-1218-15 and
 respondents/cross-appellants in A-3014-15.

 David L. Cook argued the cause for Public
 Service Electric and Gas Company, respondent
 in A-1218-15 and appellant/cross-respondent
 in A-3014-15 (Sills Cummis & Gross, attorneys;
 Mr. Cook and Steven Siegel, on the briefs).

 Richard S. Goldman argued the cause for
 Trustees of Princeton University, respondent
 in A-1218-15 (Drinker Biddle & Reath, LLP,
 attorneys; Mr. Goldman, Karen A. Denys and
 Nicole S. Bayman, on the brief).

 Donald J. Sears argued the cause for South
 Brunswick Township, respondent in A-1218-15
 and joins in the brief of respondent Trustees
 of Princeton University.

PER CURIAM

 These back-to-back appeals, which we now consolidate for

purposes of this opinion, arise from defendant South Brunswick

Township's ("Township's") adoption of two land use ordinances in

2003, and defendant Public Service Electric & Gas Company's

("PSE&G's") application in 2014 for planning board approval to

construct an electrical substation in the Township on land that

 2 A-1218-15T2
PSE&G purchased from defendant Trustees of Princeton University

("the University") in the zone covered by the ordinances.

 In Docket No. A-1218-15, plaintiffs Mark and Katherine Smith

appeal from the Law Division's October 13, 2015 order granting the

University's motion for summary judgment and the Township's motion

to dismiss plaintiffs' complaint challenging the ordinances.1 The

trial court found that plaintiffs' complaint was untimely because

they had waited almost twelve years after the adoption of the

ordinances to file it and, in any event, the arguments plaintiffs

raised lacked merit.

 In Docket No. A-3014-15, PSE&G appeals from the Law Division's

February 10, 2016 order reversing the South Brunswick Planning

Board's ("Planning Board's") approval of its application for a

variance permitting the substation project to extend into a 200-

foot residential buffer between the substation and a property

owned by a resident who did not object to PSE&G's application.

PSE&G also challenges the court's decision to decline to consider

the Planning Board's approval of the minor subdivision involved

in the project. In its cross-appeal from the February 10, 2016

order, plaintiffs challenge the court's rejection of all of the

1
 PSE&G joined in these motions.

 3 A-1218-15T2
other arguments they raised against the Planning Board's approval

of the project.

 Having reviewed the parties' respective claims in light of

the record and applicable law, we affirm the October 13, 2015

order dismissing plaintiffs' challenge to the two ordinances. We

reverse the portion of the trial court's February 10, 2016 order

that overturned the Planning Board's decision to grant PSE&G a

variance concerning the 200-foot residential buffer, and we

reinstate the Planning Board's approval of that variance. In

addition, we reverse the trial court's denial of PSE&G's minor

subdivision application and remand that matter to the trial court

with the direction that it consider PSE&G's application for that

part of its project. Finally, we affirm the trial court's

rejection of all of plaintiffs' remaining arguments.

 I.

 In 2003, the University sought general development plan

("GDP") approval from the Planning Board to develop 1,800,000

square feet of property it owned, known as the Princeton Nurseries

site. The path to approval occurred in stages, beginning with the

rezoning of Princeton Nurseries, as detailed in a developer's

agreement between the University and the Township. As part of the

agreement, the Township amended and supplemented its municipal

code by adopting two ordinances that are now at issue in this

 4 A-1218-15T2
matter: Ordinance 15-03 and Ordinance 17-03.

 Ordinance 15-03, introduced and passed on first reading by

the Township Council ("Council") on March 4, 2003, created a new

zoning category known as the Office/Corporate (OC) Zone District.

On March 13, 2003, a published notice advised that Ordinance 15-

03 would be considered at a public meeting on April 1, 2003. The

notice further advised that free copies of the ordinance could be

obtained from the municipal clerk. On April 1, 2003, the Council

adopted Ordinance 15-03, and notice of the adoption was published

on April 10, 2003.

 Ordinance 15-03 states that the purpose and intent of the OC

Zone District

 is to permit the development of executive and
 corporate offices, high-technology research
 facilities and full service hotel and
 conference activities in comprehensively
 planned facilities, with accessory activities
 provided through a plan which shall be
 consistent with any historic land use and
 character of the surrounding area.

Among the other land uses permitted in the OC zone under Ordinance

15-03 are "government and public utility facilities," a term that

is not specifically defined in the ordinance. The ordinance also

contains regulations pertaining to building sizes, lot sizes, and

buffer areas required between the OC Zone District and privately-

owned residential property in the area.

 5 A-1218-15T2
 Ordinance 17-03, which rezoned Princeton Nurseries from an

OR Office/Research/Conference District, R-1 Single-Family/Cluster

District and R-4 Village Residential District to an OC Zone

District, was also introduced by the Council on March 4, 2003. On

March 12, 2003, the Planning Board reviewed it and recommended its

approval.

 On March 13, 2003, a published notice advised that Ordinance

17-03 would be considered at a public meeting on April 1, 2003.

Personal notices and copies of Ordinance 17-03 were mailed to

those individuals and firms that owned property within 200 feet

of the Princeton Nurseries site, including plaintiffs. Plaintiff

Mark Smith received and signed for this written notice on March

19, 2003.

 Following the public meeting on April 1, 2003, the Council

announced that Ordinance 17-03 would be tabled and considered on

April 15, 2003. On April 10, 2003, another notice was published

advising the public of the upcoming April 15, 2003 meeting. On

April 15, 2003, the Council adopted Ordinance 17-03 as presented,

and notice of its adoption was published on April 24, 2003.

 With the two ordinances in place, the University filed its

GDP application on August 1, 2003. The University's GDP

application contained a general land use plan, which provided:

 6 A-1218-15T2
 6.1 General Land Use Plan. The General Land
 Use Plan indicates the tract areas and the
 limits of the land uses within the tract. The
 land uses are

  Office/Corporate District Uses
  Open Space Preserve.

 Among the uses permitted within the OC
 District, as described in the South Brunswick
 Land Use Ordinance are: executive and
 corporate offices; scientific or high
 technology laboratories devoted to research,
 design, experimentation or production;
 assembly of high technology and electronic
 equipment; health maintenance organization;
 and full service hotels/conference center.

 Section 7.1.5 of the GDP references the 200-foot residential

buffer zone requirement at issue here:

 Finally, the General Land Use Plan shows the
 required buffer area between any OC District
 and the boundary line of any privately owned
 residential property of two hundred (200)
 feet, in accordance with Section 175-
 93B(4)(f).

 On October 24, 2003, a published notice advised that a public

hearing would be held on November 3, 2003, to consider the GDP.

The notice provided a detailed synopsis of the GDP and the

University's requests for relief. Personal notices were mailed

to owners of property within 200 feet of the site, including

plaintiffs. On December 10, 2003, the Planning Board approved the

GDP. The University and the Planning Board executed a GDP

Developers' Agreement, which provided that approximately 150 acres

 7 A-1218-15T2
of Princeton Nurseries "is now zoned the OC District" and the

majority of the remaining acreage would be preserved as open space.

The Developers' Agreement also stated that "no additional

. . . environmental . . . studies" would be required for future

development of the property.

 After securing the necessary approvals, the University

expended approximately $4 million in developing the site in the

ten-year period between 2004 and 2014. According to two

uncontradicted certifications submitted by Curt Emmich,2 the vice-

president of the real estate consulting company retained by the

University to develop the Princeton Forrestal Campus, the

University undertook "significant development and incurred

significant costs" between 2004 and 2015, "all in reliance on the

2003 OC Zoning Ordinance" and GDP approval, including, among other

things, donating property it owned for open space purposes,

installing water and sewer lines, and ensuring the historic

preservation of nearby residences.

 Notice of this activity was provided to residents, including

plaintiffs. For example, in 2004, the University obtained the

Planning Board's approval for a retention basin on the site, and

2
 Emmich certified that both of his certifications were based upon
his personal knowledge after reviewing "the relevant development
files, permits, agreements, maps, site plans and documents related
to the property at issue in this case."

 8 A-1218-15T2
notice of those proceedings was published. In 2008, the University

obtained the Planning Board's approval to construct a roadway and

detention basins on the site.

 In 2014, PSE&G sought approval for a subdivision of a portion

of Princeton Nurseries, zoned as OC and consisting of a 7.369 acre

lot, for construction of a 6019 square foot electrical substation.

When it submitted this application, PSE&G was the contract

purchaser of the proposed subdivision, and it later completed the

purchase and acquired title to the property on May 29, 2015.

PSE&G's substation would be located on the north-central portion

of the subdivision, along with a 1150 square-foot control building

erected on the southeast portion of the site.

 Although PSE&G requested several variances, of particular

relevance to this appeal is the "(c)(2)" dimensional variance it

sought under N.J.S.A. 40:55D-70(c)(2) to permit the project to

extend into the 200-foot residential buffer zone located between

the subdivision and Block 99, Lot 11.04, a residential property

located north-east of the project.3 The owner of Lot 11.04 did

not file any objection to PSE&G's variance application. The

buildings on Lot 11.04 were located in the northern most portion

of the lot and were well beyond the 200-foot buffer.

3
 PSE&G also requested a variance from the requirement that its
subdivision contain at least 300 feet of street frontage.

 9 A-1218-15T2
 Plaintiffs own Block 99, Lot 8.031, a parcel of land in the

R-1 zone that is well to the west of PSE&G's subdivision, and well

outside the 200-foot buffer. Indeed, the parties agreed at oral

argument on appeal that there was at least 500 feet of buffer

between the PSE&G project and plaintiffs' property line.

Therefore, PSE&G's application for a variance of the 200-foot

buffer requirement did not involve an encroachment upon

plaintiffs' property.

 The Planning Board held a four-day public hearing at which

ten experts testified, as well as several members of the public.

Joseph Barton, a PSE&G consultant, explained that PSE&G's

application was necessitated by a finding made by Pennsylvania-

Jersey-Maryland Interconnection, LLC ("PJM"), a regional

independent power transmission organization that operates under

the Federal Energy Regulatory Control Commission ("FERC"). 4

According to Barton, PJM conducted a study that concluded that "if

a [substation] project was not executed, there would be voltage

violations in the region." If proper voltage was not sustained,

then "rolling brownouts" could result, which would involve

"tak[ing] customers out of service." Additionally, PSE&G would

4
 PJM oversees and coordinates power transmission in thirteen
states, operates transmission assets owned by its member
companies, including PSE&G, and performs reliability studies.

 10 A-1218-15T2
face "fines and penalties" from FERC if it did not build a new

substation to service the area and its customers.

 To address PJM's concerns, PSE&G proposed a two-phase

project. Barton explained that during the first phase,

construction of the new substation would link together two existing

New Jersey substations. Through that linkage, voltage reliability

in the area would improve for 62,000 current customers. In the

second phase of the project, additional transformers and switch

gears would be installed to distribute power to 25,000 new

customers.

 According to Barton, the substation would be gated and fenced,

with "an elaborate landscape plan around the property" designed

to hide it from view. While the substation would typically be

unmanned, a PSE&G certified traveling operator would inspect it

once per week. Electricity would travel out of the substation

underground, rather than through overhead wires held by poles.

 M.D. Sakib, PSE&G's principal system planning engineer,

testified that based upon PJM's simulations and studies, as

corroborated by PSE&G, the anticipated voltage violation was

expected to occur in 2015. According to Sakib, there was "a very

high possibility" of future brownouts occurring if the proposed

substation was not built. Sakib further explained that while

phase one of the project would support voltage in the area by

 11 A-1218-15T2
increasing power availability and creating "another hub" for the

South Brunswick area, phase two would add more power capacity to

accommodate new homes and businesses. Because Penns Neck, an

existing substation serving the Township, had minimal capacity for

growth and enlargement, Sakib testified that the better solution

was construction of a new substation as proposed by PSE&G.

 Christopher Light, PSE&G's senior project manager, testified

that although other sites were considered, the proposed location

for the substation was "the perfect site" to tie all of the lines

together, as required by PJM. Light explained that the site's

location would enable two substations, located to the north and

south, to be linked as required by PJM.

 Light testified that if the station was moved west on the

property, then it would not encroach upon the 200-foot residential

buffer of Lot 11.04. However, that orientation would "move[] the

station more into the view shed of some of the residents on Ridge

Road" and "extend[] the length of [the] underground feeds that go

into the station increasing exposure of those circuits a little

bit." Moving the project to the west would also bring it closer

to plaintiffs' property line.

 Light testified that it was possible that PSE&G "could install

a new technology that is called GIS" (gas-insulated switch gear)

that might partially reduce the substation's footprint in one

 12 A-1218-15T2
specific area of the project. However, Light explained that

implementing this technology would not "help . . . in reducing the

overall size of the station." In addition, using GIS technology

would cost ratepayers an additional $8 million, or approximately

an extra 25% of the total project cost, and Light explained that

PSE&G prefers air, rather than gas, insulated equipment.

 Art Bernard, a professional planner, testified on behalf of

PSE&G that the project would promote the Township's general master

plan goals, including economic development, and would benefit the

public through the provision of "more reliable power." Bernard

further stated that the project advanced the purpose of the

Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-1 to -112, by

encouraging appropriate use of the land for projects designed to

serve and protect the public.

 Bernard found "no substantial negative impact" related to the

residential buffer variance, as the substation's placement would

"have a minimal impact on adjacent properties." He explained that

the sole affected property, Lot 11.04, was "a very long residential

lot, and [the resident's] home is something like 1,000 feet from

that corner" of the site that would encroach upon the buffer zone.5

Bernard further testified that PSE&G "provided a very generous

5
 As previously noted, plaintiffs' property has at least a 500-
foot buffer from PSE&G's project.

 13 A-1218-15T2
landscaping plan . . . that will screen the facility and the basin

from the homes." Finally, Bernard testified that all the lines

feeding into the substation will be underground, and "the ambient

sounds along Ridge Road would be such that people will not hear

the facility in their homes."

 Although the subdivision did not have any street frontage,

Bernard likewise found "no negative impact" with regard to that

requested variance, because the site was "not going to generate

any traffic to speak of" and would be accessible to employees and

emergency personnel through an access road. Bernard further

testified that the public would benefit from the site's lack of

street frontage, because it made the facility more secure.

 Edward Clark, an acoustical consultant and licensed

professional engineer, completed a sound study for the project.

He described the two kinds of noise produced by substation

transformers: a "hum" and a "broadband noise associated with

cooling fans." He testified that none of the sound frequencies

generated by the transformer would exceed any of the maximum levels

set in the Township's code. Moreover, Clark concluded that it

would be "difficult to hear the substation at points offsite"

given other ambient noise in the area, such as vehicle traffic on

Route One.

 In support of their opposition to the project, plaintiffs

 14 A-1218-15T2
presented the testimony of Russell Smith, a professional engineer.

Smith testified that the project did not comply with the

residential buffer on the east side near Lot 11.04 and would extend

into the 200-foot wide buffer for that property by as much as 160

feet. Smith further testified that the proposed access road would

not provide adequate access for emergency vehicles, particularly

since it was located in an area which floods "periodically during

storms." Smith opined that the proposed width of the access road,

twenty feet, was "substandard" and would "make it difficult for

two vehicles to pass" through, thereby hampering emergency vehicle

access.

 Carlos Rodriguez, a professional engineer and planner,

testified that "there is nothing unique about this site . . . that

would mandate the proposed subdivision and site layout as

specifically proposed." He opined that the (c)(2) variance "cannot

be granted without detriment to the public good or integrity to

the neighborhood" as the facility would "dramatically undermine

the character of the neighborhood" and decrease property value.

He further testified that since the 200-foot residential buffer

zone is clearly noted in the GDP, any intrusion "represents a

violation of the GDP and can only be sanctioned by way of an

amendment to that same document."

 As a better alternative, Smith and Rodriguez proposed moving

 15 A-1218-15T2
the site out of the residential buffer zone altogether and

eliminating the need for a variance. Rodriguez added that any

constraints or hardships asserted by PSE&G, such as the greater

expense of GIS technology, or the inability to acquire more land

from the University, were "self-imposed."

 Regarding PSE&G's request to waive submission of an

environmental impact statement ("EIS"), Rodriguez testified that

the Planning Board violated the Township code because it failed

to seek advice from the Township Environmental Commission before

granting the waiver. Rodriguez also testified that to the extent

PSE&G was relying on environmental documentation submitted with

the 2003 GDP, a proper EIS was not completed at that time.

 Later colloquy among Planning Board members explained that

every application is sent to the Environmental Commission for

review. On the next hearing date, one Planning Board member, who

also sat on the Environmental Commission, clarified that the

Commission reviewed and reported on the application, but never

received a request for advice from the Planning Board regarding

the waiver.

 Sonya Thorpe, an acoustical consultant, reviewed Clark's

report but did not submit a report of her own. Thorpe testified

that Clark's report was deficient and incomplete because it did

not describe the "octave band numbers." However, she later

 16 A-1218-15T2
conceded that Clark's report indicated that an octave band analysis

had been performed. When questioned by a Planning Board member,

Thorpe also admitted that Clark conducted a sound test of the

proposed facility that complied with the governing State

regulations.6

 On December 17, 2014, the Planning Board voted to approve

PSE&G's application and grant it all necessary variance relief,

including relief from the 200-foot buffer in terms of Lot 11.04.

The Planning Board's seventeen-page resolution summarized all of

the relevant witness testimony and set forth detailed findings of

fact and conclusions of law in support of its decision.7

 On February 17, 2015, plaintiffs filed two complaints in lieu

of prerogative writs challenging PSE&G's right to proceed with its

project. In one complaint,8 plaintiffs asserted that Ordinance

15-03 and Ordinance 17-03, which had been adopted almost twelve

6
 Another pair of objectors, Gang Qian and Xiaodan Zhang, presented
testimony from Joseph Mazotas, a real estate appraiser. Mazotas
testified that a substation would be visible from the Qian/Zhang
property, and that it would significantly affect their home's
property value (by five or ten percent, or more) and marketability.
However, Mazotas admitted that he had not done any comparability
studies, nor was he familiar with the landscaping plan intended
to cover the project from view. These two objectors are not
parties to the present appeals.
7
 We address the Planning Board's decision in greater detail in
Section III of this opinion.
8
 Docket No. MID-L-00907-15.

 17 A-1218-15T2
years previously, were nevertheless void due to lack of adequate

notice to them; unconstitutionally vague because it was allegedly

not clear that a "substation" was a "public utility facilit[y]"

permitted in the OC zone; and constituted illegal "spot zoning."

As noted above, defendants moved for summary judgment and a

dismissal of plaintiffs' complaint.

 On October 13, 2015, the trial judge issued an order,

supported by a detailed written decision, granting defendants'

motions and dismissing plaintiffs' complaint. The judge found

that plaintiffs' complaint in lieu of prerogative writs was

untimely under Rule 4:69-6 because they waited almost twelve years

to file a challenge to the 2003 ordinances. In addition, the

judge considered plaintiffs' challenges to the ordinances and

found that they lacked merit.

 In the second complaint they filed on February 17, 2015,9

plaintiffs sought to reverse the Planning Board's approval of

PSE&G's application for variance relief and minor subdivision

approval. Following a two-day hearing on the record developed

before the Planning Board and the parties' oral argument, the

trial judge10 entered a judgment and written decision. The judge

9
 Docket No. MID-L-00906-15.
10
 The same trial judge presided over both proceedings involved in
these appeals.

 18 A-1218-15T2
reversed the Planning Board's grant of a (c)(2) residential buffer

variance to PSE&G. In so ruling, the judge found that PSE&G did

not show that "its plan is a better zoning alternative" for the

property. The judge also stated that "[t]he Board made no findings

as to the reasonableness of not being able to build a gas insulated

switch (GIS) gear facility, nor . . . relative to the

reasonableness of PSE&G's inability to acquire (or [the

University's] unwillingness to sell) additional lands" that would

eliminate the need for the 200-foot residential buffer variance.

Thus, the judge concluded that the Planning Board's grant of the

variance was "not supported by the record."

 Because PSE&G would not be able to construct its project as

it was then configured without the residential buffer variance for

Lot 11.04, the trial judge also determined that the Planning

Board's grant of the minor subdivision to PSE&G could not stand.

In all other respects, the judge found that plaintiffs' objections

to the Planning Board's decision lacked merit.

 These appeals and cross-appeal followed.

 II.

 We first address plaintiffs' contention in Docket No. A-1218-

15 that the trial judge erred in granting summary judgment to

defendants and dismissing their challenge to the validity of the

two 2003 ordinances. Plaintiffs contend that although they

 19 A-1218-15T2
captioned their pleading as a complaint in lieu of prerogative

writs, their claims were actually cognizable under the Uniform

Declaratory Judgments Law, N.J.S.A. 2A:16-50 to -62, because they

sought a declaration that the ordinances were unconstitutional and

unlawful. Therefore, plaintiffs allege that even though they

waited almost twelve years after the adoption of the ordinances

to file their complaint, they are not subject to the forty-five

day filing deadline for actions in lieu of prerogative writs

established by Rule 4:69-6.

 Our review of a ruling on summary judgment is de novo,

applying the same legal standard as the trial court. Nicholas v.

Mynster, 213 N.J. 463, 477-78 (2013). Summary judgment is

appropriate where "the pleadings, depositions, answers to

interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact challenged and that the moving party is entitled to

a judgment or order as a matter of law." R. 4:46-2(c).

 Applying these principles, we discern no basis for disturbing

the trial judge's decision to dismiss plaintiffs' complaint,

although we reach this conclusion for a slightly different reason

 20 A-1218-15T2
than that expressed by the judge.11 Whether plaintiffs' complaint

was an action in lieu of prerogative writs subject to the time

limitations of Rule 4:69-6 or a declaratory judgment action not

subject to a specific statute of limitations, (see Bell v. Township

of Stafford, 110 N.J. 384, 390 (1988)), is not the critical issue

here because, no matter what nomenclature is used to identify

their action, plaintiffs' complaint was properly dismissed under

the doctrines of laches and equitable estoppel.

 The doctrine of laches is an equitable defense which may be

interposed even in the absence of a specific statute of

limitations. Lavin v. Bd. of Ed., 90 N.J. 145, 151 (1982). Laches

"precludes relief when there is an 'unexplainable and inexcusable

delay' in exercising a right, which results in prejudice to another

party." Fox v. Millman, 210 N.J. 401, 417 (2012). "The time

constraints of laches, unlike the periods prescribed by the statute

of limitations, are not fixed but are characteristically

flexible." Lavin, supra, 90 N.J. at 151.

 The doctrine of laches has been described as:

 [N]ot an arbitrary or technical doctrine.
 Where it would be practically unjust to give
 a remedy, either because the party has, by his
 [or her] conduct, done that which might fairly

11
 See State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011)
(stating an appellate court is "free to affirm the trial court's
decision on grounds different from those relied upon by the trial
court").

 21 A-1218-15T2
 be regarded as equivalent to a waiver of it,
 or where by his [or her] conduct and neglect
 he [or she] has, though perhaps not waiving
 that remedy, yet put the other party in a
 situation in which it would not be reasonable
 to place him [or her] if the remedy were
 afterwards to be asserted, in either of these
 cases, lapse of time and delay are most
 material.

 [Id. at 152 (quoting Hall v. Otterson, 52 N.J.
 Eq. 522, 535 (Ch. 1894)).]

The length of and reasons for the delay, and changing conditions

of either party, are the most important factors. Ibid. (citing

Pavlicka v. Pavlicka, 84 N.J. Super. 357, 368-69 (App. Div. 1964)).

"The length of the delay alone or in conjunction with the other

elements may result in laches." Ibid. (citing Obert v. Obert, 12

N.J. Eq. 423, 428-30 (E. & A. 1858)).

 Equitable estoppel is a similar doctrine.

 Equitable estoppel is the effect of the
 voluntary conduct of a party whereby he [or
 she] is absolutely precluded, both at law and
 in equity, from asserting rights which might
 perhaps have otherwise existed, either of
 property, of contract, or of remedy, as
 against another person, who has in good faith
 relied upon such conduct, and has been led
 thereby to change his [or her] position for
 the worse, and who on his [or her] part
 acquires some corresponding right, either of
 property, of contract, or of remedy.

 [Highway Trailer Co. v. Donna Motor Lines,
 Inc., 46 N.J. 442, 449 (1966) (citing Pomeroy
 Equity Jurisprudence, § 804 (5th Ed. 1941)).]

 22 A-1218-15T2
 Here, plaintiffs' complaint was clearly barred by the

doctrines of laches and equitable estoppel. As detailed above,

the Township Clerk provided published notice on March 13, 2003 of

its proposed adoption of Ordinance 15-03 and, on that same date,

sent personal notice to plaintiffs of the proposed adoption of

Ordinance 17-03, together with a copy of the ordinance itself.

Plaintiffs received that personal notice on March 19, 2003. The

Township adopted both ordinances in April 2003.

 Between April 2003 and February 2015 when plaintiffs filed

their complaint challenging the ordinances, the University made

significant investments in, and improvements on, the property in

reliance on the ordinances and the lack of a timely challenge to

their validity. Among other things, the University expended nearly

$1 million in applying for and complying with the 2003 GDP

approval; spent $150,000 developing and implementing an Open Space

Initiative/Donation Agreement to Green Acres; donated land by

creating the Mapleton Preserve in the Township; contributed

$300,000 to the rehabilitation of historic structures in the

Mapleton Preserve; subjected residences owned by the University

to deed restrictions for historic preservation; spent $200,000 on

environmental studies; and expended $100,000 on the installation

of a twelve-inch waterline along Ridge Road and an additional

$150,000 for storm water basin piping adjacent to Greenwood Avenue.

 23 A-1218-15T2
These are funds which can obviously not be recouped and, just as

significantly, the disposition of the University's property for

other purposes cannot be undone.12

 We reject plaintiffs' contention that the trial court was

obligated to allow them to pursue discovery to attempt to contest

these facts, a process that would have only prolonged this

extremely belated litigation and which could have imposed

significant additional burdens on the parties. We also reject

plaintiff's argument that such discovery was necessary to

determine which expenditures related to property on the South

Brunswick side of the project and which was related to the

Plainsboro Township side, a breakdown that would be of no or scant

relevance.

 Plaintiffs' failure to challenge the adoption of the

ordinances for almost twelve years is inexcusable under any

reasonable assessment of the idiosyncratic circumstances of this

case, especially in light of the University's obvious detrimental

reliance upon their non-action. On this record, plaintiffs are

barred by the doctrines of laches and equitable estoppel from

prosecuting an action challenging the 2003 ordinances at this late

12
 For its part, PSE&G undertook years of planning and also expended
substantial sums in preparing its electrical substation project
on land it ultimately purchased from the University.

 24 A-1218-15T2
date. Therefore, the trial judge properly dismissed plaintiffs'

complaint as untimely.

 However, even if plaintiffs' complaint were not barred by

these doctrines, we are satisfied that the trial judge also

properly dismissed plaintiffs' allegations concerning the

propriety of the ordinances on their merits.

 Plaintiffs argued that Ordinance 17-03 constituted illegal

"spot zoning" in that it "violate[d] equal protection by conveying

privileges to [the University] next door while failing to convey

similar privileges to others," including themselves. In rejecting

this contention, the trial judge found that plaintiffs failed to

provide sufficient proof "that Ordinance 17-03 [wa]s inconsistent

with the Township's Master plan" or "that the rezoning was not

pursuant to a comprehensive plan." We agree with the judge's

cogent analysis.

 "Spot zoning is the antithesis of . . . planned zoning."

Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 134 (1965). Our

Supreme Court has defined "spot zoning" as "the use of the zoning

power to benefit particular private interests rather than the

collective interests of the community." Taxpayers Ass'n of

Weymouth Twp. v. Weymouth Township, 80 N.J. 6, 18 (1976), cert.

denied, 430 U.S. 977, 97 S. Ct. 1672, 52 L. Ed. 2d 373 (1977).

Spot zoning transpires "when a municipality seeks to relieve a

 25 A-1218-15T2
particular property of the burden imposed by its zoning

classification so as to benefit the lot owner or permit an

incompatible use." Jennings v. Borough of Highlands, 418 N.J.

Super. 405, 425-26 (App. Div. 2011). "[T]he test for spot zoning

is whether the particular provision of the zoning ordinance is

made with the purpose or effect of furthering a comprehensive

scheme or whether it is designed merely to relieve a lot or lots

from the burden of a general regulation." Id. at 426 (alteration

in original) (quoting Palisades, supra, 44 N.J. at 134).

 Here, plaintiffs failed to allege that the effect of the

ordinance was inconsistent or incompatible with the Township's

comprehensive zoning plan, as required by Jennings, supra, 418

N.J. Super. at 426. Moreover, the fact that the University was

initially the only landowner in the OC Zone District is simply not

prima facie proof of spot zoning. Palisades, supra, 44 N.J. at

135. Indeed, it is well established that an otherwise valid

ordinance is "unobjectionable even if . . . initially proposed by

private parties [who] are . . . its ultimate beneficiaries."

Taxpayers Ass'n, supra, 80 N.J. at 18. Because nothing in the

record supports a finding that Ordinance 17-03 was inconsistent

with the Township's comprehensive zoning plan, the trial judge

correctly determined that plaintiffs' spot zoning claim lacked

merit.

 26 A-1218-15T2
 Plaintiffs next argued that the published notices for

Ordinance 15-03 and Ordinance 17-03 were defective because they

did not contain a "brief summary of the main objectives or

provisions of the ordinance." They also asserted that the

personal, mailed notice they admittedly received for Ordinance 17-

03 did not contain "the nature of the matter to be considered" or

"street names, common names or other identifiable landmarks" to

identify the affected zoning district.

 The trial judge rejected these contentions. The judge found

that the Township's published notice for Ordinance 15-03 complied

with N.J.S.A. 40:49-2.1(a), which requires "citing such proposed

ordinance by title, giving a brief summary of the main objectives

or provisions" plus a statement that copies are on file for public

examination, and notice of the time and place for further

consideration of the proposal. The judge also found that N.J.S.A.

40:55D-62.1 did not require the Township to send personal notice

of Ordinance 15-03 to plaintiffs because that ordinance "created

a classification that did not previously exist" and "was neither

a change in classification within a district, nor a boundary change

to a district." At the time of its adoption, the newly created

zone "had no impact upon any property owner." As to Ordinance 17-

03, the judge found that the Township's published notice comported

with N.J.S.A. 40:49-2.1(a), and that the personal notice satisfied

 27 A-1218-15T2
N.J.S.A. 40:55D-62.1. For the reasons that follow, we agree with

the judge that the notices met the requirements of N.J.S.A. 40:49-

2.1(a) and N.J.S.A. 40:55D-62.1.

 At a minimum, municipalities must substantially comply with

statutory published notice requirements. Wolf v. Shrewsbury, 182

N.J. Super. 289, 295 (App. Div. 1981), certif. denied, 89 N.J. 440

(1982). "Failure to substantially comply with the requirements

of a statute requiring publication renders the ordinance invalid."

Ibid. "A notice of a proposed change in the zoning laws must be

reasonably sufficient and adequate to inform the public of the

essence and scope of the proposed changes." Id. at 296.

 In support of their contentions, plaintiffs primarily rely

upon our decision in Rockaway Shoprite Assocs. v. City of Linden,

424 N.J. Super. 337 (App. Div. 2011), certif. denied, 209 N.J. 233

(2012), which stressed the importance of N.J.S.A. 40:49-2.1(a)'s

"brief summary" requirement. There, we found that a published

notice regarding rezoning of the former GM Linden Assembly Plant

site was non-compliant with N.J.S.A. 40:49-2.1(a) because it

provided no indication of what new zones were being created, or

what new uses would be permitted on the site. Id. at 343. We

reasoned:

 While the published notice at most alerted the
 public that some type of zoning amendment was
 being considered regarding the GM site,

 28 A-1218-15T2
 nothing therein informed interested persons of
 the nature or extent of the change or whether
 it was consequential enough to warrant their
 attendance at, and participation in, the
 ensuing public hearing.

 [Id. at 349-50.]

Thus, we held that "New Jersey requires at a minimum that published

notice of a zoning ordinance creating new zones and uses applicable

to an area identify and briefly describe those new zones and uses."

Id. at 346.

 The published notice for Ordinance 15-03 contains a one-

sentence "brief summary" which states: "This ordinance amends and

supplements Chapter 175 of the South Brunswick Code by the addition

of Section 175-93, Office/Corporate District." The notice further

provides the ordinance's full title, gives the time and place of

the upcoming public meeting, and explains that copies of the

ordinance can be obtained without charge.

 While the summary is brief, and does not list any of the

permitted uses within the newly-created OC Zone District, it

nevertheless adequately conveys the ordinance's main objective as

required by N.J.S.A. 40:49-2.1(a), i.e., the "addition of an

Office/Corporate District." Unlike in Rockaway, where the

ordinance rezoned a large, existing property, Ordinance 15-03

created a new zoning district not yet applicable to any area.

Under these unique circumstances, we are satisfied that the 2003

 29 A-1218-15T2
published notice was "reasonably sufficient," as it bore no effect

upon plaintiffs' property, or any other property. Wolf, supra,

182 N.J. Super. at 296.

 In addition, copies of the ordinance were available for

review, and interested parties could have attended the public

meeting to learn more. Finally, personal notice was not required

in connection with Ordinance 15-03 because N.J.S.A. 40:55D-62.1

applies only "to two events—classification changes and boundary

changes." Mahwah Realty Assocs. v. Township of Mahwah, 430 N.J.

Super. 247, 257 (App Div. 2013). Ordinance 15-03 effectuated

neither a classification change nor a boundary change.

 Turning to the required notice for Ordinance 17-03, both

N.J.S.A. 40:49-2.1(a) and N.J.S.A. 40:55D-62.1 are applicable.

The published notice's "brief summary" for this ordinance

provided: "This ordinance amends the zoning map of the Township

of South Brunswick by re-zoning certain property along southbound

Route 1 from OR, R-1 and R-4 to OC." It also stated the ordinance's

title, the time and location for the upcoming public meeting, and

advised that copies of the ordinance were available free of charge.

 Thus, the Township's published notice substantially complied

with the requirements of N.J.S.A. 40:49-2.1(a). It was clear from

the notice that the ordinance's main objective was the rezoning

of property to an OC classification. Therefore, the published

 30 A-1218-15T2
notice was "sufficient to alert a reasonably intelligent reader

as to the nature and import of the . . . changes in the zone plan."

Wolf, supra, 182 N.J. Super. at 296.

 The Township also duly provided personal notice of the

ordinance to plaintiffs, and this notice included a copy of the

ordinance and the proposed zoning map identifying the exact

location of the property to be re-zoned. Thus, the personal notice

substantially complied with N.J.S.A. 40:55D-62.1 by providing the

nature of the matter to be considered, street names, and

identifiable landmarks in order to identify the affected zoning

district. Therefore, the trial judge committed no error when he

held that the Township substantially complied with the statutory

notice requirements for both ordinances.

 Finally, like the trial judge, we also reject plaintiffs'

contention that the term "public utility facilities" in Ordinance

15-03 was unconstitutionally vague and, therefore, they and other

members of the public would not have been able to determine that

an electrical substation might be built in the OC zone.

 "The established rules of statutory construction govern the

interpretation of a municipal ordinance." Township of Pennsauken

v. Schad, 160 N.J. 156, 170 (1999). On appeal, we review a trial

judge's statutory interpretation de novo." Commerce Bancorp, Inc.

v. InterArch, Inc., 417 N.J. Super. 329, 334 (App. Div. 2010)

 31 A-1218-15T2
(citing State v. Gandhi, 201 N.J. 161, 176 (2010)), certif. denied,

205 N.J. 519 (2011).

 "Our analysis of a statute begins with its plain language,

giving the words their ordinary meaning and significance." In re

Estate of Fisher, 443 N.J. Super. 180, 190 (App. Div. 2015) (citing

State v. Olivero, 221 N.J. 632, 639 (2015)), certif. denied, 224

N.J. 528 (2016). "It is a basic rule of statutory construction

to ascribe to plain language its ordinary meaning. When that

language 'clearly reveals the meaning of the statute, the court's

sole function is to enforce the statute in accordance with those

terms.'" Ibid. (citations omitted).

 As noted above, Ordinance 15-03 specifically states that

"public utility facilities" are one of the uses permitted in the

OC zone. In N.J.S.A. 40:55D-6, the MLUL defines a "public utility"

as "any public utility regulated by the" Board of Public Utilities

("BPU"). Here, the proposed substation facility will be owned and

maintained by PSE&G, which is the State's largest regulated public

utility and, as such, is subject to the BPU's jurisdiction and

regulation. See In re Pub. Serv. Elec. & Gas Co.'s Rate

Unbundling, 167 N.J. 377, 382 (2001) (noting that PSE&G is one of

the State's "existing four [electric utility monopolies]"

regulated by the BPU).

 Thus, the "public utility" in the term "public utility

 32 A-1218-15T2
facilities" referenced in Ordinance 15-03 obviously includes

PSE&G. Just as obviously, the remaining word in that term,

"facilities" would include an electrical substation operated by

the public utility. In this regard, the ordinary definition of a

"facility" is "something (such as a building or large piece of

equipment) that is built for a specific purpose." Merriam-Webster

Online Dictionary, http://www.merriam-webster.com (last visited

May 12, 2017) (emphasis added). A "substation" is generally

defined as "a place where the strength of electricity is changed

as the electricity passes through on its way from the power plant

to homes and businesses." Ibid. The fact that PSE&G's substation

includes both a building and equipment clearly brings it within

the common definition of "facility" as used in Ordinance 15-03.

We need not address hypothetical scenarios not present in this

case testing the breadth of the term.

 Moreover, Joseph Barton, who served as PSE&G's expert

consultant, testified that a substation is a critical component

of a public utility's electrical transmission system. Without it,

the other components of an electrical system, such as conduits,

cables, wires, towers, and poles, referenced in other statutes

 33 A-1218-15T2
describing public utility facilities,13 would be useless. Thus,

contrary to plaintiffs' contention, the plain language of

Ordinance 15-03 creating the OC Office/Corporate District provided

clear and explicit notice that "public utility facilities" were

permitted in the newly created OC zone.

 In sum, we affirm the trial judge's October 13, 2015 order

granting defendants' motion for summary judgment and dismissing

plaintiffs' complaint challenging the Township's adoption of

Ordinance 15-03 and Ordinance 17-03.

 III.

 We now turn to PSE&G's contentions in its appeal in Docket

No. A-3014-15. PSE&G argues that the Planning Board's decision

to grant the residential buffer variance was not arbitrary,

capricious, or unreasonable, and that the trial judge mistakenly

failed to defer to the Planning Board's findings of fact and

conclusions of law, which were supported by substantial credible

13
 See, e.g., N.J.S.A. 40:11A-7.1 (defining "public utility
facility" to include "any tracks, pipes, mains, conduits, cables,
wires, towers, poles and other equipment and appliances . . . of
any public utility"). That definition is repeated within other
chapters of Title 40, and in other Titles. See N.J.S.A. 40:14A-
20, N.J.S.A. 40:37D-7, N.J.S.A. 40:68A-54 (utilizing same
definition). See also N.J.S.A. 58:22-14, N.J.S.A. 52:27I-36,
N.J.S.A. 52:9Q-22, N.J.S.A. 40A:12A-10, N.J.S.A. 40A:26A-8,
N.J.S.A. 40A:31-8, N.J.S.A. 34:1B-8, N.J.S.A. 27:23-6, N.J.S.A.
58:1B-8, N.J.S.A. 12:11A-7, and N.J.S.A. 5:10-8 (also utilizing
same definition).

 34 A-1218-15T2
evidence in the record. We agree.

 "[W]hen reviewing the decision of a trial court that has

reviewed municipal action, we are bound by the same standards as

was the trial court." Fallone Props., L.L.C. v. Bethlehem Twp.

Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). Thus, our

review of the Board's action is limited. See Bressman v. Gash,

131 N.J. 517, 529 (1993) (holding that appellate courts are bound

by the same scope of review as the Law Division and should defer

to the local land-use agency's broad discretion).

 In reviewing a municipal zoning board's decision, courts must

be mindful that the Legislature vested these boards with the

discretion to make decisions that reflect the character and level

of development within their municipality. Booth v. Bd. of

Adjustment of Rockaway, 50 N.J. 302, 306 (1967). A planning

board's discretionary decisions carry a rebuttable presumption of

validity. Harvard Enters., Inc. v. Bd. of Adjustment of Madison,

56 N.J. 362, 368 (1970).

 It is well-established that "a decision of a zoning board may

be set aside only when it is 'arbitrary, capricious or

unreasonable.'" Cell South of N.J., Inc. v. Zoning Bd. of

Adjustment of W. Windsor, 172 N.J. 75, 81 (2002) (quoting Medici

v. BPR Co., 107 N.J. 1, 15 (1987)). "[P]ublic bodies, because of

their peculiar knowledge of local conditions, must be allowed wide

 35 A-1218-15T2
latitude in their delegated discretion." Jock v. Zoning Bd. of

Adjustment of Wall, 184 N.J. 562, 597 (2005). Therefore, "[t]he

proper scope of judicial review is not to suggest a decision that

may be better than the one made by the board, but to determine

whether the board could reasonably have reached its decision on

the record." Ibid.

 The burden is on the challenging party to overcome this

highly deferential standard of review. Smart SMR of N.Y., Inc.

v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327

(1998). A court must not substitute its own judgment for that of

the local board unless there is a clear abuse of discretion. See

Cell South, supra, 172 N.J. at 82. As we stated in CBS Outdoor,

Inc. v. Borough of Lebanon Planning Bd., 414 N.J. Super. 563, 577

(App. Div. 2010), "[e]ven were we to harbor reservations as to the

good judgment of a local land use agency's decision, 'there can

be no judicial declaration of invalidity in the absence of clear

abuse of discretion by the public agencies involved.'" (quoting

Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296-97 (1965).

 N.J.S.A. 40:55D-70 authorizes local zoning and planning

boards to grant variances from zoning ordinances. N.J.S.A. 40:55D-

70(c) defines two categories of variances: N.J.S.A. 40:55D-

70(c)(1), known as the "hardship variance," and N.J.S.A. 40:55D-

70(c)(2), known as the "flexible or bulk variance." PSE&G sought

 36 A-1218-15T2
a (c)(2) variance from the 200-foot residential buffer

requirement.

 The Supreme Court succinctly described the test for granting

a (c)(2) variance as follows:

 N.J.S.A. 40:55D-70(c)(2) permits a
 variance for specific property, if the
 deviation from bulk or dimensional provisions
 of a zoning ordinance would advance the
 purposes of the zoning plan and if the benefit
 derived from the deviation would substantially
 outweigh any detriment. The applicant bears
 the burden of proving both the positive and
 negative criteria.

 [Ten Stary Dom P'ship v. Mauro, 216 N.J. 16,
 30 (2013).]

 Satisfaction of the positive criteria requires "proof that

the characteristics of the property present an opportunity to put

[it] more in conformity with the development plans and advance the

purposes of zoning." Ibid. The purposes of zoning include

promoting "public health and safety" and a "desirable visual

environment"; providing "adequate light, air and open space";

securing "safety from fire, flood, [and] panic"; and providing

"sufficient space in appropriate locations for a variety of

. . . uses . . . in order to meet the needs of all New Jersey

citizens." N.J.S.A. 40:55D-2. As to the negative criteria, the

applicant must prove "that the variance would not result in

substantial detriment to the public good or substantially impair

 37 A-1218-15T2
the purpose of the zone plan." Ten Stary Dom, supra, 216 N.J. at

30.

 Significantly, under this "more flexible test," an applicant

for a (c)(2) variance need not demonstrate hardship. Price v.

Himeji, LLC, 214 N.J. 263, 297 (2013) (citing Lang v. Zoning Bd.

of Adjustment, 160 N.J. 41, 57 (1999)); Jacoby v. Zoning Bd. of

Adjustment, 442 N.J. Super. 450, 470 (App. Div. 2015). In

addition, "the magnitude of the deviation from the

. . . dimensional requirements of the zoning ordinance and the

impact on the zoning plan are often a matter of degree" and, as

such, "a board's consideration of a variance should recognize that

fact." Ten Stary Dom, supra, 216 N.J. at 32.

 As our Supreme Court explained almost twenty-nine years ago:

 By definition . . . no (c)(2) variance
 should be granted when merely the purposes of
 the owner will be advanced. The grant of
 approval must actually benefit the community
 in that it represents a better zoning
 alternative for the property. The focus of a
 (c)(2) case, then, will not be on the
 characteristics of the land that, in light of
 current zoning requirements, create a
 "hardship" on the owner warranting a
 relaxation of standards, but on the
 characteristics of the land that present an
 opportunity for improved zoning and planning
 that will benefit the community.

 [Kaufmann v. Planning Bd. for Twp. of Warren,
 110 N.J. 551, 563 (1988) (emphasis added).]

 In short, the granting of a "(c)(2) variance will stand if,

 38 A-1218-15T2
after adequate proofs are presented, the Board concludes that the

'harms, if any, are substantially outweighed by the benefits.'"

Jacoby, supra, 442 N.J. Super. at 471 (quoting Kaufmann, supra,

110 N.J. at 565).

 Applying these standards, we are constrained to conclude that

the trial judge mistakenly overrode the Planning Board's decision

to grant a variance of the 200-foot residential buffer to PSE&G

so that it could construct an electrical substation on its

property. The evidence adduced during the Planning Board's four-

day hearing overwhelmingly supported its decision to permit a

variance that affected only one property, Lot 11.04, whose owner

raised no objection to the application. The record also plainly

demonstrated that the grant of this decidedly minor variation in

the overall zoning scheme would enable PSE&G to comply with PJM

and FERC requirements and ensure that thousands of property owners

in the area, including plaintiffs, were supplied with safe and

efficient electrical power in the face of growing energy demands

in the region. Under these circumstances, the Planning Board's

decision clearly represented a "better zoning alternative for the

property" and, therefore, the Planning Board's decision should

have been affirmed.

 The trial judge's conclusion that the planning board did not

provide an adequate explanation of its decision is not supported

 39 A-1218-15T2
by our review of that decision. The Planning Board specifically

found that "the proposed use [of the land] [wa]s a permitted use"

that "promotes the safe and efficient flow of electricity to the

community-at-large" by increasing power reliability and adding new

capacity for up to 25,000 future customers. It further found that

"the existing network structure . . . is close to capacity" and

"if the proposed substation is not built within a short period of

time, it is reasonably foreseeable that brown outs are at greater

risk to occur in the area." As detailed in Section I of this

opinion, these findings are firmly grounded in the record.

 As to the location chosen for PSE&G's project, the Planning

Board found that the undeveloped property, located in an OC zone,

was "an excellent location for the substation" in order "to link

. . . two . . . other substations located to the north and south

of the site" and was "adjacent to existing PSE&G property that

[would] facilitate the construction of the underground outlets

required."

 The Planning Board found that Lot 11.04 was the only one

affected by the (c)(2) variance. While acknowledging the

"significant amount of testimony presented by objectors . . . that

the site was not suitable for the use because it require[d] a

[residential buffer] variance," the Planning Board found that Lot

11.04, whose owner has not objected to a variance that affects

 40 A-1218-15T2
only his property, was "a long and narrow lot" and that its

"structures . . . [were] in the northern most portion of the lot,

furthest away from the site and well beyond the [200-foot] buffer."

 Regarding the potential negative impact on surrounding

residential properties, the Planning Board found that "Lot 11.14,

a Township-owned dedicated open space lot, runs between [PSE&G's]

property and Lot 11.04" and "buffers the negative impact the

substation will have" upon that lot. The Planning Board also

concluded that any negative visual impact from the substation

would be minimized because much of the equipment would be

underground, and "significant landscaping" provided by PSE&G would

further "buffer and practically shield the [thirteen-foot control]

building from the adjacent residential properties."

 The Planning Board carefully balanced concerns that the

substation might affect residential property values with the

project's potential to advance the zoning plan. The Planning

Board stated:

 As to [Mazotas's] valuation testimony, the
 proposed use is a permitted use so the
 testimony was arguably not relevant.
 Furthermore, the testimony provided was not
 well researched and was not based on any
 meaningful data. The Board provides little
 weight to this testimony especially in light
 of the fact that the GDP for this area allows
 for a significant amount of commercial
 development. The Board finds that the expert
 testimony on valuation failed to distinguish

 41 A-1218-15T2
 the impact the substation would have on the
 value of the residential properties in the
 area as compared to the impact of more than
 . . . 1,800,000 square feet of commercial
 space would have on the value of the nearby
 residential properties. Thus, the Board finds
 credible the testimony of [PSE&G's] planner
 that the detrimental impact the substation
 will have on the public good and the intent
 and purpose of the Master Plan and Zone Plan
 will be minimal.

 Concerning noise levels, the Planning Board determined that

noise on the site "will not exceed state or local noise standards."

It accepted Clark's testimony as credible, and found Thorpe's

testimony less credible because she "failed to state that the

manner and methods used by [Clark] deviated from acceptable

standards in the industry." Clark testified that he performed

various simulation tests and concluded that it would be "difficult

to hear the substation at points offsite" given the ambient noise

level in the area. Although Thorpe criticized Clark's methodology

and conclusions, she did not complete a study of her own and

admitted that Clark's study complied with applicable testing

requirements.

 The record also does not support the trial judge's finding

that the Planning Board did not adequately address Light's

testimony concerning the possibility that PSE&G could use GIS

technology to reduce the overall size of the project and thereby

lessen or eliminate the need for it to deviate from the 200-foot

 42 A-1218-15T2
buffer for Lot 11.04. In making this finding, the judge only

focused on Light's testimony that implementing GIS technology at

a cost of an additional $8 million to ratepayers might reduce the

size of one component of the project. However, the judge did not

consider Light's clarifying testimony that in terms of reducing

"the overall size of the station[,]" GIS technology "doesn't really

help you[.]"

 Finally, the judge found that the Planning Board did not make

any findings as to the reasonableness of PSE&G's asserted inability

to acquire additional lands from the University that would have

enabled PSEG to construct the substation while preserving the 200-

foot buffer. Thus, the judge concluded that any "hardship"

suffered by PSE&G was "a self-created one."

 We disagree with the trial judge's assessment. First, because

this was an application for a (c)(2) variance, PSE&G was not

required to establish a hardship in order to justify its need for

the residential buffer variance. Price, supra, 214 N.J. at 297.

As we recently noted in Jacoby, "[a] (c)(2) variance contemplates

that even absent proof of a hardship, a bulk or dimensional

variance that advances the purposes of the MLUL may be granted if

the benefits of the deviation outweigh the detriment." Supra, 442

N.J. Super. at 470. As discussed above, that is clearly the case

here.

 43 A-1218-15T2
 Contrary to the trial judge's finding, any hardship upon

PSE&G as the result of the University's refusal to sell it

additional land was obviously not a "self-imposed" one. The

University and PSE&G are clearly separate entities and the

University was under no obligation to sell PSE&G any more property

than it chose to convey. Finally on this point, PSE&G's

acquisition of additional land from the University in the manner

suggested by plaintiffs as a means of keeping the project within

the buffer in terms of Lot 11.04 would appear to move the

substation closer to plaintiffs' property.

 In sum, the Planning Board properly concluded on the record

before it that "the benefits in granting the variance

. . . substantially outweigh[ed] the detriments" and that the

variance could "be granted without causing substantial detriment

to the public good." Because the Planning Board's determination

to grant the residential buffer variance was well-supported by

substantial credible evidence in the record and was neither

arbitrary, capricious, or unreasonable, the trial judge erred by

substituting his judgment for that of the Planning Board.

Therefore, we reverse the judge's determination and reinstate the

Planning Board's approval of PSE&G's application for a residential

buffer variance.

 44 A-1218-15T2
 IV.

 The trial judge also reversed the Planning Board's decision

granting PSE&G's request for minor subdivision approval. In

explaining this aspect of his decision, the judge stated:

 Because the geometry of the proposed
 subdivision is at the core of the variance
 request, it is incumbent upon this court to
 also reverse the decision of the Board
 granting PSE&G's application for subdivision.
 To allow the subdivision grant to stand
 without an approved site plan upon which it
 is based is contradictory to common sense.

As a result, the judge declined to decide whether the Planning

Board's grant of the subdivision variance for lack of street

frontage was reasonable and, solely on that basis, he reversed the

Planning Board's decision.

 In light of our decision that the Planning Board's approval

of the residential buffer variance was appropriate and must be

reinstated, the trial judge may now address plaintiffs' challenge

to the minor subdivision approval. Therefore, we reverse the

judge's denial of the Planning Board's approval of PSE&G's

subdivision application and remand so that the judge may promptly

consider the matter. We further direct that the remand proceedings

be completed within ninety days. Any party or parties aggrieved

by the court's ruling on the issue may file a timely new appeal

with this court under a new docket number.

 45 A-1218-15T2
 V.

 Finally, we briefly address the arguments raised by

plaintiffs in their cross-appeal in Docket No. A-3014-15.

Plaintiffs contend that: (1) an electrical substation is not a

permitted use under the University's GDP; (2) the Planning Board

"illegally waived" the required EIS; (3) the Planning Board

"approved the site plan without the acoustic testing required by

local and state law"; and (4) the Planning Board's findings "were

not substantiated" or "adequately supported by the record or are

contrary to the record."14

 We have reviewed plaintiffs' contentions on these points in

light of the record and the applicable law and conclude that they

are without sufficient merit to warrant discussion in a written

opinion. R. 2:11-3(e)(1)(E). Nevertheless, we provide the

following comments.

 Contrary to plaintiffs' assertion, the installation of an

electrical substation was clearly consistent with the University's

GDP. As the Planning Board noted in its decision approving PSE&G's

variance application, the resolution approving the GDP plainly

"states that the approval is for '1,800,000 [square feet] of office

14
 Plaintiffs also contend that the term "public utility
facilities" does not apply to electrical substations. As discussed
in Section II above, this contention lacks merit and, therefore,
we need not address it further here.

 46 A-1218-15T2
corporate space and other uses permitted in the OC zone.'" As

noted above, "public utility facilities," like the substation at

issue here, are expressly permitted in the OC zone under Ordinance

15-03. Therefore, we reject plaintiffs' contention on this point.

 Plaintiffs' argument that the Planning Board "illegally

waived" the requirement that an EIS be submitted ignores several

key facts. First, the GDP between the University and the Township,

which was approved by the Planning Board, "stated that an [EIS]

would not have to be submitted for development of any portion of

the property contained within the GDP." Thus, the Planning Board

properly determined that it was not necessary for PSE&G to submit

an EIS.

 In addition, the Planning Board found, based upon the colloquy

between its members on this issue, that the Township's

"Environmental Commission reviewed the application and did not

request that the applicant submit an" EIS. Moreover, to the extent

that an EIS might be required, the Planning Board granted PSE&G's

request for a waiver of this requirement as it was permitted to

do under the governing ordinance. Under these circumstances, we

discern no basis for disturbing the trial judge's determination

that plaintiffs' argument on this issue lacked merit.

 Plaintiffs next argue that the trial judge incorrectly

rejected their contention that the acoustic testing performed by

 47 A-1218-15T2
Clark, who was PSE&G's expert, was flawed. We disagree.

 The Planning Board made the following findings with regard

to Clark's testimony and the testimony of plaintiffs' expert,

Thorpe:

 The applicant presented expert testimony
 regarding the noise that will be generated
 from the facility. The testimony presented
 [from Clark] was that based on the studies
 performed, the site will not exceed state or
 local noise standards . . . . As to the issue
 of acoustics/noise, expert testimony [from
 Thorpe] was provided in opposition to the
 application. [Thorpe] testified that she
 would have performed the noise study in a
 different manner . . . . In her opinion, her
 suggested method would have been more thorough
 than the method used by [Clark]. However,
 [Thorpe] failed to state that the manner and
 methods used by [Clark] deviated from
 acceptable standards in the industry as to how
 acoustical/noise studies are to be performed.
 Thus [Thorpe] testified to a preference as to
 how the applicant's noise study could have
 been performed rather than raising genuine
 irregularities or deviations from accepted
 standards in how the study was performed.

 The Planning Board considered the potential negative impact

on "the quality of life mainly due to noise generated from the

substation," but concluded that "[t]he detrimental impacts are

limited to those property owners immediately adjacent to the

project site and are mitigated through many factors" including

"the significant landscape buffer." Moreover, as a condition of

its approval, the Planning Board required PSE&G, "within six months

 48 A-1218-15T2
of the substation operating . . . [to] perform [an]

acoustical/noise test to insure the substation generates noise

that does not exceed State or local standards."

 The trial judge affirmed the Planning Board's determination,

noting that while Thorpe criticized certain aspects of Clark's

report, she conceded that Clark's study complied with State and

local regulations, and that she did not perform her own study.

The judge's decision on this point is well supported by the record

and, therefore, there is no basis for overturning it.

 Finally, plaintiffs argue generally that the Planning Board's

decision was not adequately supported by the record. However, as

discussed in detail in Section III of this opinion, this is clearly

not the case.15

 VI.

 In sum, we affirm the October 13, 2015 order dismissing

plaintiffs' challenge to Ordinance 15-03 and Ordinance 17-03. We

reverse the portion of the February 10, 2016 order that overturned

the Planning Board's approval of PSE&G's residential buffer

variance, and we reinstate the Planning Board's approval of that

15
 For completeness purposes, we note that any issues raised by
plaintiffs in their appeal in Docket No. A-1218-15 and their cross-
appeal in Docket No. A-3014-15 that are not specifically addressed
in this opinion lack sufficient merit to warrant discussion. R.
2:11-3(e)(1)(E).

 49 A-1218-15T2
application. We also reverse the trial court's denial of the

minor subdivision approval PSE&G received from the Planning Board,

and remand to the trial court for consideration of that issue

consistent with this opinion. These remand proceedings must be

completed within ninety days. In all other respects, the February

10, 2016 order is affirmed.

 Affirmed in part; reversed in part; and remanded. We do not

retain jurisdiction.

 50 A-1218-15T2